HARRIS, et ux. *v.* ARMSTRONG

No. 40582 November 25, 1957 98 So. 2d 463

*Arrington & Arrington,* Hazlehurst, for appellants.

194

*E. A. Turnage,* Monticello, for appellee.

Roberds, P. J.

On July 14, 1955, Wesley Harris was the owner of a certain forty acres of land located in Lawrence County, Mississippi. On that day Wesley Harris and his wife Annie, by warranty deed, conveyed that forty acres of land, less one-half of the minerals, to Burnett B. Arm-

strong. The consideration was $280, which was paid in cash.

On January 23, 1956, Harris and his wife filed the bill in this cause charging that Armstrong, the grantee in the deed, obtained the title through fraud, and that he held the title as trustee for Wesley Harris. The charge of fraud was grounded in the averments that (1) a confidential relationship existed between Armstrong and Wesley Harris; (2) that Armstrong orally promised that he would reconvey the land to Harris upon refund of the purchase price; and (3) that the price paid by Armstrong for the land was grossly inadequate.

■■ Armstrong, in his answer, denied the allegations of the bill. The chancellor, after hearing evidence, dismissed the bill, thereby necessarily finding against complainants upon their charges of wrongdoing on the part of Armstrong. From that action by the chancellor, Harris and his wife appeal here. They say the chancellor was manifestly wrong. They admit we should not reverse the chancellor on his finding of fact if he had before him substantial evidence to support such findings.

■■ As to the question of relationship, there is really no proof that a confidential relationship existed between Armstrong and Harris. The most that is shown is that they had been neighbors and had known each other for many years, and that one year, or maybe two years, Harris worked a small acreage of land belonging to Armstrong. Harris did testify that he had confidence in, and had advised to some extent with, Armstrong's father and also his grandfather, but it is not shown he ever sought the advice of Armstrong upon any matter.

Further, it is undisputed that Harris approached Armstrong in an effort to sell Armstrong the land, and Harris made the price on the land. It is not suggested that Armstrong tried to get him to sell. The evidence discloses that Harris discussed with a number of people the advisability of selling the land in an effort to be eligible

for old age pension. Mr. Jimmie Douglass, a justice of the peace, in whose district Harris lived, suggested to Harris that he approach Mr. Armstrong about buying the land, since Armstrong lived close to the land. And after Harris approached Armstrong and made a proposition to sell the land for $280 several days elapsed before the sale took place. The chancellor was amply justified in finding that no confidential relationship existed between Harris and Armstrong.

 The testimony as to the oral promise of Armstrong to reconvey the land is vague and contradictory. In his bill, Harris stated that Armstrong said he would convey the land, upon the request of Harris, to "any person named by him (Harris) upon the refund of the $280." Harris testified that Armstrong agreed to "deed it back to me or some of my children." Annie Harris, wife of Wesley Harris, and one of the grantors in the deed, testified that Armstrong said "Well, some day, I might let the children have it but I can't let Wesley have it." Armstrong, as a witness, said "The only thing he asked me in time if I ever wanted to get rid of the lands would I let some of his children have it back and I said I would." In Lipe v. Souther, 224 Miss. 473, 80 So. 2d 471, the reporter deduced this rule: "Evidence to prove existence of a parol constructive trust must be clear and convincing, and must establish facts and circumstances giving rise to trust with extraordinary degree of certainty and clarity." And even though the oral promise should be clear and specific, it is not enforceable as such under the statute of frauds, (Section 269, Miss. Code 1942), although such a promise is a fact to be considered by the court, along with the other facts and circumstances, in determining whether the deed was procured by fraud. Lipe v. Souther, supra. In that case, this Court said: "An enforceable trust will not arise from a mere breach of an oral promise to hold land in trust. There must be conduct influential in pro-

ducing the result, and but for which such result would not have occurred amounting, in the view of a court of equity, to fraud in order to save the case from the Statute of Frauds.'' The effect of an oral promise to convey, or reconvey, land is stated in Ragsdale v. Ragsdale, 68 Miss. 92, 8 So. 315, in these words: ''We would not be understood as sanctioning the doctrine that an enforceable trust will arise from the mere breach of an oral promise, however solemn, to hold land in trust. There must be conduct influential in producing the result, and but for which such result would not have occurred, amounting, in the view of a court of equity, to fraud, to save the case from the statute of frauds. A merely oral promise, and its subsequent breach, however disappointing and harmful, and though ever so reprehensible in morals, is not of itself enough to cause a court of chancery to declare a trust.''

The oral promise, to be pertinent and relevant, must substantially influence and induce the result about which complaint is made. The chancellor, very reasonably, could have found under the testimony in this case, as presumably he did, that the oral promise, such as it was, did not induce, or materially aid in inducing, the execution of the deed by Wesley Harris and his wife. Wesley, who was about seventy-eight years of age, had been endeavoring for a number of years to qualify for an old age pension. He had enlisted the aid of a number of people, including the supervisor and the justice of the peace of the district in which he lived, as well as an attorney in Lawrence County, and even Burnett Armstrong himself, in his effort to qualify for such relief. He had not been successful. He had been informed by those in charge of the Welfare Department of the county that he would not be qualified for such aid as long as he owned the land here in controversy. He began to try to find a purchaser for the land. As stated above, the justice of the peace of his district suggested that Mr.

Burnett B. Armstrong, living some two and a half miles from Harris, might be induced to purchase the land. Harris sought out Mr. Armstrong and proposed to sell the land to him, naming his own price of $7 per acre. Armstrong did not then agree to buy and Harris came back to see Armstrong at least once, and maybe twice, before Armstrong agreed to purchase. The inducing cause for executing the deed, in addition to the consideration, seems clearly to have been the belief that by so doing he would be qualified for old age, financial assistance. The fact that for some reason, not clearly shown in the record, he was later denied aid, does not affect the situation, except perhaps to suggest an occasion for instituting this proceeding.

As to the adequacy of the consideration paid for the land, it is not disputed that Harris made the proposal to Armstrong to sell for the stated price. It is not contended that Armstrong initiated the question or tried to fix the price or undertook to persuade Harris to sell for less than Harris asked. Nothing was done to influence Harris. The matter was under consideration for several days before Armstrong agreed to buy. It is unnecessary to detail the testimony pro and con as to adequacy of consideration. That was a question of fact. The chancellor found that the price was rather "cheap" but the disparity between the price paid and the true value certainly proved no fraud or wrongdoing on the part of Armstrong. We will refer only to enough of the testimony on value to show the chancellor had substantial evidence to support his conclusions. Armstrong described the land as "old poor, worn-out land—overflow land." Other witnesses used about the same language in describing the nature of the land. They also said the land had no appreciable merchantable timber on it. Mr. Raz Case, the supervisor from the district in which the land is located, testified that lands in that neighborhood were worth at the time of the trial from

$8 to $12.50 per acre. Mr. Jimmie Douglass, a justice of the peace, living near the lands in controversy, testified that lands in that community were worth from one dollar per acre to twenty dollars per acre, depending upon the nature of the soil, the improvements, the amount and nature of the timber thereon, etc. He testified he was familiar with the land here involved and that in his opinion it was worth $5 per acre. He said some had sold for $8 per acre "* * * where it was seeded with young pine timber." Two years before he had bought forty acres within four miles of the Harris land for $40. The record does not disclose what, if any, improvements are located on the land. It is shown that there is no appreciable merchantable timber on it. The timber had been sold and removed.

There was some testimony tending to show that the land was worth more than the consideration paid for it. This was largely by inference from the fact that some eight oil and gas leases had been executed on lands located in different parts of Lawrence County, and from the fact that the land in controversy had been assessed for taxes at $300. However, the considerations paid for the leases were not shown, nor did the evidence disclose whether the leases had been renewed or had expired, nor, in most cases, where the leased lands were located with reference to the land in controversy. It was shown that there had not been any mineral lease on the lands in controversy for eight years prior to the time of the trial. The evidence fails to show whether there had been any lease prior to the eight years. As to the tax valuation, Mrs. Mattie E. Hickman, agent of the Welfare Department, testified that she understood the assessing authorities tried to assess lands in the county at thirty-seven and one-half percent of their true value. However, she had not seen the lands here involved and did not know their value. No assessing, or taxing, official of the county testified about the assessment valuations. Harris bought twenty acres of the land March 31, 1950, paying

$75 therefor, and conveying ten acres of other lands to his grantor. He purchased the other twenty acres in 1913 for $60.

It should be stated that the testimony shows, without dispute and without objection, that Mr. Burnett B. Armstrong has lived all of his life in the neighborhood where he now resides, and that his reputation for honesty, integrity and fair dealing is "excellent."

██ ██ The burden of showing fraud on the part of Armstrong in acquiring title to the lands in controversy was upon Harris, and this he had to do by clear and convincing testimony. Moore v. Crump, et al., 84 Miss. 612, 37 So. 109; Summer v. Summer, supra; 54 Am. Jur., p. 478, Section 620. The last authority states the rule in this language: "The general rule is that oral proof of an express trust in realty or personalty which is not required to be in writing, or of facts giving rise to a resulting or constructive trust, must be received with caution. So reluctant are the courts to ingraft a trust by parol on the legal title to real estate, or to enforce an alleged parol trust in personal property, that there is perhaps no better-established doctrine than the one which requires a high degree of proof in order to establish the trust by parol evidence."

We would not be justified in reversing the chancellor in his conclusion that Harris did not meet the burden imposed upon him.

Affirmed.

*Hall, Kyle, Ethridge* and *Gillespie, JJ.,* concur.