642 So.2d 361 (1994)
William R. ALVAREZ, Sr., First Seventh-Day Adventist Church of Memphis, Tennessee, Andrea Boles, and Brian Boles, a Minor
v.
Beverly D. COLEMAN, Kathryn D. Farris, Lucille S. Kruser, Louvie S. Land, Louise S. Milam, and Fred Coleman.
No. 92-CA-0159.
Supreme Court of Mississippi.
June 16, 1994.
Rehearing Denied September 29, 1994.
*362 Winn Davis Brown, Jr., Southaven, for appellant.
A.L. (Joe) Pressgrove, Jr., Southaven, for appellee.
Before PRATHER, P.J., and SULLIVAN and JAMES L. ROBERTS, Jr., JJ.
JAMES L. ROBERTS, Jr., Justice, for the Court:

I.

INTRODUCTION
On November 18, 1981, Vernard and Dixie Droke executed the "Droke Family Trust Agreement," and transferred all their property, including a half-interest in a 39.1 acre plot of land, to themselves as trustees, with William Alvarez as co-trustee. The trust was to support Dixie and Vernard for life; upon the death of the survivor, Alvarez was to divide the trust property in half, creating Trust A for Dixie's designees (her great grandchildren) and Trust B for Vernard's designee (the First Seventh Day Adventist Church in Memphis). The trust agreement was revocable by either Settlor until the death of either; at such point it would become irrevocable. Also that day, Vernard and Dixie executed nearly identical wills, leaving all but several dollars of their property *363 to the Droke Family Trust. After Dixie's death in 1982, Vernard revoked the trust, and in 1987, executed a will leaving his estate to five of his nieces. Upon Vernard's death in 1988, his 1981 will was offered into probate by Alvarez, and his 1987 will was offered by Beverly Coleman, one of the nieces. Trial was had to determine whether the Alvarez or Coleman parties were entitled to the half interest in the 39.1 acres of land.
The chancellor held that 1) the Droke Family Trust never came into existence, because it was not properly acknowledged or recorded with the Chancery Clerk; 2) there was no evidence that the 1981 wills were made pursuant to any agreement; 3) upon Dixie's death, Vernard became the sole record owner of the half-interest in land; 4) Vernard's revocation was unnecessary, because no trust existed; 5) Alvarez was barred from seeking relief because the six-year statute of limitations had run; 6) the Coleman parties were the sole owners of the half-interest in the land. Alvarez, representing Dixie's great grandchildren, appealed, citing the following errors:
I. THE CHANCELLOR'S DECISION WAS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE AND CONTRARY TO THE LAW OF THE STATE OF MISSISSIPPI.
II. THE WORKING NOTES OF ATTORNEY JAMES PURPLE SHOULD HAVE BEEN ACCEPTED AS EVIDENCE OF THE DROKE'S INTENTIONS REGARDING THE DOCUMENTS OF NOVEMBER 18, 1981.
III. THE WILL OF DIXIE DROKE, AS AN AUTHENTICATED, STIPULATED DOCUMENT WAS ADMISSIBLE INTO EVIDENCE AS SUCH UNDER M.R.E. 901A AND M.R.E. 402 AS EVIDENCE OF ITS EXECUTION AND CONTENT.
IV. THE CHANCERY COURT ACTED IMPROPERLY BY FAILING TO APPLY EQUITABLE PRINCIPLES IN THIS CASE.
V. THE TRIAL COURT WAS BOUND BY THE APPELLEE'S ADMISSION THAT THE DROKES FORMED A JOINT OR MUTUAL TESTAMENTARY PLAN.
VI. MR. DROKE'S 1981 WILL BECAME IRREVOCABLE AFTER FULL PERFORMANCE BY MRS. DROKE IN RELIANCE UPON THAT WILL.
VII. THE COURT SHOULD HAVE FOUND FOR APPELLANTS ON THEIR CLAIM FOR BREACH OF CONTRACT TO MAKE A WILL.
VIII. THE CHANCELLOR WAS INCORRECT IN HOLDING THE SIX-YEAR STATUTE OF LIMITATIONS APPLICABLE TO THE TRUST.
IX. SECTION 89-5-3 M.C.A. (1972) IS APPLICABLE TO THE DROKE FAMILY TRUST AS AN UNRECORDED DEED.
We find that under contract principles, and under a constructive trust theory, the Alvarez parties are entitled to ownership of one-half of the marital estate, including the one-half interest in the 39.1 acre plot of land. We reverse and remand this case for an equal division of the marital estate according to the Trust agreement.

II.

FACTS AND PROCEDURAL HISTORY
This case concerns the ownership of a half-interest in a 39.1 acre plot of land in DeSoto County. Said half interest was the major, or at least the most coveted asset of Dixie Drokes and her husband Vernard Drokes. Dixie died in 1982, and Vernard in 1988. Their respective heirs both claim title to the half-interest.
Vernard and Dixie had no children from their marriage. Dixie had one daughter, Edith Boles, who was the mother of Andrew Boles, Jr., and the grandmother of Andrea and Brian Boles. Vernard had no children.
*364 The 39.1 acre plot of land had been conveyed by warranty deed to Dixie and her daughter Edith in 1952. Therefore, Dixie and Edith each owned an undivided half interest in the property.
On November 16, 1977, Dixie conveyed her half interest in the 39.1 acres to Vernard and Dixie Droke "as tenants by the entirety, with the right of survivorship and not as tenants in common." The deed was recorded.
On November 18, 1981, Vernard and Dixie executed nearly identical wills. Each will, after nominal bequests of one dollar, devised the remainder of the testator's estate to "the Trustee of the revocable trust created of even date herewith." William Alvarez was named executor in both wills.
Also on November 18, 1981, Vernard and Dixie executed an instrument entitled "Revocable Trust Agreement/Droke Family Trust." Under the agreement, Vernard and Dixie conveyed to themselves as trustees, with Alvarez as co-trustee, all property they owned at that time.[1] Income from the trust, as well as any portion of its principal, was to be used by Vernard and Dixie during their lives. Following their deaths, co-trustee Alvarez was to divide the trust property in half, creating two separate trusts, "A" and "B." Trust A would be held for the use of Dixie's two great grandchildren, Andrea and Brian Boles, and ultimately divided between them. Trust B would be distributed to the First Seventh-day Adventist Church in Memphis. The agreement provided that either Settlor (Dixie or Vernard) could revoke or amend the instrument "until the death of either of the Settlors," at which time it would become "both irrevocable and unamendable." The wills and the trust agreement were witnessed by three individuals and certified by a Tennessee notary.
Dixie died on May 29, 1982. Her 1981 will was apparently never filed for probate. On August 12, 1982, Vernard executed an instrument entitled "Revocation of Droke Family Trust." Therein, Vernard stated that he was revoking the trust agreement. He directed the trustees to distribute all assets in the trust to him immediately. Vernard mailed a copy of this notarized revocation to Alvarez.
On August 26, 1987, Vernard executed a will devising most of his estate to five of his nieces in equal shares. One of the nieces, Beverly Coleman, was named as executrix.[2]
Vernard died on October 29, 1988. Alvarez offered Vernard's November 18, 1981, will into probate. Beverly offered Vernard's August 1987 will. The chancellor admitted both wills to probate.
The devisees of Vernard Droke's August 1987 will (identified as "the Coleman parties" or "Coleman") filed suit to quiet title in the DeSoto County Chancery Court on August 9, 1989. The complaint named as defendants the First Seventh-Day Adventist Church, and Dixie's great grandchildren, Andrea and Brian Boles.[3] The Coleman parties claimed title to the real property under Vernard's 1987 will.
On December 4, 1989, Alvarez, the First Seventh-Day Adventist Church, and the Boles (identified as "the Alvarez parties" or "Alvarez") filed an answer, counterclaim, and third-party complaint. The Alvarez parties claimed title to the real estate as beneficiaries of the trust.[4]
On October 17, 1990, the Coleman and Alvarez parties entered into stipulations as to *365 the authenticity of Vernard's 1987 will, Vernard's trust revocation and trust revocation letter to Alvarez, Vernard's and Dixie's 1981 wills, and the Droke Family Trust Agreement. The stipulations were entered into evidence at trial held October 18, 1990. Testimony is summarized below.

Edith Boles
Dixie's daughter Edith testified that she had visited her mother and stepfather (Vernard) about every two months during the last year of her mother's life, and that Vernard "seemed to resent the fact that he had the care" of Dixie. She stated that her mother required a lot of care; Vernard cared for her part of the time, as did Edith and one of the nieces. Edith stated that Vernard resented her (Edith) as well; the resentment stemmed from Dixie having placed some Tennessee property she owned (in which Vernard had no interest) in trust for her grandchildren, and also from Dixie having deeded Edith's father's estate to Edith. Edith stated a will of her mother's made prior to November of 1981 had left her something more than $1.00.
Edith testified that Vernard had expressed concern that "everything is in your's and your mother's name; you will kick me out when she dies." Edith stated that she had assured him that she would "leave him completely alone" if Dixie died before he did. Edith stated that she had known nothing of the November 1981 wills and trust agreement until after her mother's death.

Ann Alvarez
William Alvarez's wife Ann testified that she and her husband had been present on November 18, 1981, when the wills and trust agreement had been executed. She stated that the drafting attorney, James Purple,[5] had reviewed the documents with Dixie and Vernard, and that Purple and the Drokes discussed the effect of the trust; specifically, that it was revocable while both were living, but would become irrevocable upon the death of either. Ann further testified that Dixie had expressed concern for her great-grandchildren, and wanted to be sure that her wishes concerning them would be carried out after her death. Vernard had stated that he wanted his share to go to the church. Ann testified that she had heard Dixie express this concern for her great-grandchildren on several other occasions. Ann stated that three other friends of the Drokes (Mr. and Mrs. Herring, and Bernice Mills) were also present at the execution of the documents.

William Alvarez
Alvarez testified that he had known Dixie for about sixty years, and Vernard about twenty-five or thirty; in addition, he and the Drokes belonged to the same Seventh-Day Adventist Church. Alvarez stated that the Drokes had asked him to be co-trustee and executor of their wills, and that he had been present on November 18, 1981 at the signing of the documents. Alvarez testified that Purple had prepared the documents, and had reviewed them with the Drokes at the time of the signing, reading each paragraph, and "making sure that they understood it" after each one. In addition, Purple had explained that the trust was revocable until the death of either; that Purple "asked each one and they both agreed and they understood" this provision. Alvarez testified that Dixie had expressed concern to him and Ann about what would happen to her great grandchildren if she died, and expressed an intent in executing the documents that her grandchildren would take some of her interest. She also expressed concern for Vernard's care. Vernard said he wanted "his portion of the document to go to the church," because "he didn't see his family very often and ... they had done nothing for him." In addition, Purple explained Alvarez's duties as co-trustee of the trust and administrator of the estates.
Alvarez testified that prior to Dixie's death, there was nothing for him to do for the Droke Family Trust, because Vernard and Dixie were co-trustees and administered their own estate. After Dixie died, Alvarez stated, he talked to Vernard a few times, "but there was nothing that I could do because he, also, was a co-trustee, and administered the estate at that time."
*366 Alvarez stated that he had received the revocation notice from Vernard about three months after Dixie died. He did not do anything about it, because "the Will (sic) stated that it was irrevocable after death."

Beverly Coleman
Beverly Coleman, Vernard's niece, testified that she had visited her uncle and Dixie at their home about two or three times a year. After Dixie died, she would take her uncle to buy groceries and help him with things he needed to do. Beverly testified that two of the other nieces would also visit and help out; for nine months, the six nieces and nephew took turns caring for Vernard around the clock.
Beverly stated that she didn't think Vernard and Dixie ever got along; she stated that "Uncle Vernard was not permitted to do hardly anything. Dixie ran everything, and I think they argued and fussed all the time."
Beverly testified on cross-examination that after Dixie died, Vernard held "Droke family reunions." She stated that Vernard had told her that Dixie had not allowed his folks to visit; now that she was gone, he was going to have his family. Beverly agreed that Vernard had sold furniture and given away other items.

* * *
The court issued its judgment on March 20, 1990, finding that the Droke Family Trust had never come into effect, as the trust agreement contained no acknowledgment of delivery, and was never filed for record in the DeSoto Chancery Clerk's office. The court further found that neither of Dixie's and Vernard's 1981 "instruments" or "paper writings" indicated that they had been made pursuant to any agreement; neither mentioned the other, and were merely "separate wills." The court found that Dixie's 1981 "instrument" had never obtained the status of a will, never having been filed for probate, and therefore, it could not be used as evidence. The court held that on Dixie's death, Vernard became the sole record owner of the one-half share in the land. The court held that Vernard's "revocation" of the trust had been unnecessary, because no trust existed. Nevertheless, the court also held that such revocation had set the six-year statute of limitations in motion, and since no action had been brought by the Alvarez parties within six years of that date, they were barred from relief. The court found that Vernard's 1987 will had revoked his 1981 "paper writing." Therefore, the court held, the devisees of this will (the Coleman parties) were the sole owners of the land.
The Alvarez parties' Motion for Rehearing was overruled on December 16, 1991. Alvarez, Andrea and Brian Boles filed their appeal to this Court on February 10, 1992.[6]

III.

DISCUSSION OF ISSUES
We find merit to issues IV, VI, VII and VIII, and discuss those issues only.

IV. THE CHANCERY COURT ACTED IMPROPERLY BY FAILING TO APPLY EQUITABLE PRINCIPLES IN THIS CASE
Alvarez contends that Miss. Code Ann. (1972) 91-9-1 (Supp. 1993) allows an unrecorded trust to take effect, despite non-compliance with the statute, where equity so requires. Alvarez argues that the chancellor wrongly failed to consider the equitable principles of "clean hands," constructive or resulting trusts, equitable estoppel, and breach of fiduciary duty by Vernard.
Coleman argues that the chancellor correctly found that the trust agreement never came into existence under Miss. Code Ann. (1972) § 91-9-1.
Section 91-9-1 of Miss. Code Ann. (1972) provides:
Hereafter all declarations or creations of trusts or confidence of or in any land shall be made and manifested by writing, signed by the party who declares or creates such trust, or by his last will, in writing; or else they shall be utterly void. Every writing declaring or creating a trust shall be acknowledged or proved as other writings, *367 ... shall be lodged with the clerk of the chancery court of the proper county to be recorded, and shall only take effect from the time it is so lodged for record. Where any trust shall arise or result, by implication of law, out of a conveyance of land, such trust or confidence shall be of the like force and effect the same as it would have been if this statute had not been passed.

(emphasis added). With respect to the Droke Family Trust agreement, the chancellor stated:
The third instrument, or paper writing, executed by Vernard Droke and Dixie Droke, styled "Revocable Trust Agreement-Droke Family Trust," was never lodged with the Clerk of the Chancery Court of DeSoto County, Mississippi to be recorded as required by Section 91-9-1, Mississippi Code, Annotated. The so-called Trust instrument contained no acknowledgment of delivery, and, hence, was not entitled to record, from which it inevitably follows that the attempted trust never had any effect.
The two flaws in the trust agreement noted by the chancellor  lack of acknowledgment of delivery, and failure to record  generally prevent a trust from taking effect. Smith v. Smith, 233 So.2d 527 (Miss. 1970); Thames v. Holcomb, 230 Miss. 387, 92 So.2d 548 (1957); Board of Trustees of M.E. Church South v. Odom, 100 Miss. 64, 56 So. 314 (1911). The Droke Family trust therefore fails under 91-1-1, unless, as argued by Alvarez, it is saved by last sentence of the statute.
The last sentence of § 91-1-1 contemplates constructive and resulting trusts, affording them validity despite a lack of acknowledgment, delivery, or record. The nearly-identical predecessor to Miss. Code Ann. § 91-1-1 (Supp. 1993), Section 269 of the Miss.Code (1942), requiring all trusts in land to be in writing and recorded to be valid, has been held inapplicable to resulting and constructive trusts "in cases too numerous for citation." Stone v. Sample, 216 Miss. 287, 292, 63 So.2d 555 (1953). See also Pitchford v. Howard, 208 Miss. 567, 45 So.2d 142 (1950).
We have defined a constructive trust as follows:
A constructive trust is one that arises by operation of law against one who, by fraud, actual or constructive, by duress or abuse of confidence, by commission of wrong, or by any form of unconscionable conduct, artifice, concealment, or questionable means, or who in any way against equity and good conscience, either has obtained or holds the legal right to property which he ought not, in equity and good conscience, hold and enjoy.
Planters Bank & Trust Co. v. Sklar, 555 So.2d 1024, 1034 (Miss. 1990), citing Sojourner v. Sojourner, 247 Miss. 342, 153 So.2d 803, 807 (1963). See also Conner v. Conner, 238 Miss. 471, 119 So.2d 240 (1960). Constructive trusts are created for the purpose of preventing unjust enrichment, whereby one unfairly holding a property interest may be compelled to convey that interest to whom it justly belongs. Allgood v. Allgood, 473 So.2d 416 (Miss. 1985). "It is unjust enrichment under cover of the relation of confidence, which puts the court in motion." Russell v. Douglas, 243 Miss. 497 at 506, 138 So.2d 730 (1962) citing Sinclair v. Purdy, 235 N.Y. 245, 139 N.E. 255 (1923) (Cardoza, J.).
Any transaction may provide an appropriate setting for creating a constructive trust; their forms and varieties are "practically without limit." Planters Bank, 555 So.2d at 1034, citing 89 C.J.S. Trusts, § 142 at 1027 (1955). Allgood v. Allgood, 473 So.2d 416, 421 (Miss. 1985). Moreover, the terms "confidence" and "confidential relationship" are construed liberally in favor of the confider and against the confident for purposes of raising a constructive trust. Russell v. Douglas, 243 Miss. at 505, 138 So.2d 730; Adcock v. Merchants & Manufacturers Bank, 207 Miss. 448, 42 So.2d 427 (1949).
In Russell v. Douglas, 243 Miss. 497, 138 So.2d 730 (1962), we summarized Mississippi constructive trust law:
A constructive trust is a fiction of equity. It is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial *368 interest, equity converts him into a trustee. The equity must shape the relief and courts are bound by no unyielding formula. It arises regardless of intention or agreement, express or implied. The trust is raised by implication of law. Fraud need not be shown.
Russell v. Douglas, 243 Miss. 497, 505-506, 138 So.2d 730, 734, cited in Planters Bank, 555 So.2d at 1034 (citations omitted). See also Sojourner v. Sojourner, 247 Miss. 342, 153 So.2d 803 (1963) ("it is necessary only to establish such conduct and bad faith as would shock the conscience of the court").
The evidence to establish a constructive trust must be "clear and convincing." Planters Bank, 555 So.2d at 1034; Allgood v. Allgood, 473 So.2d 416, 421; Shumpert v. Tanner, 332 So.2d 411, 412 (Miss. 1976); Stovall v. Stovall, 218 Miss. 364, 67 So.2d 391 (1953); Coleman v. Kierbow, 212 Miss. 541, 54 So.2d 915 (1951).
In Lipe v. Souther, 224 Miss. 473, 80 So.2d 471 (1955), we considered whether a constructive trust arose on a plot of land deeded to a woman by her parents, based on an alleged oral agreement to hold half the land in trust for her two brothers, and based on the confidential relationship among the family members. Fraud was not alleged. We found insufficient proof to establish a trust, and stated:
An enforceable trust will not arise from the mere breach of an oral promise to hold land in trust. There must be conduct influential in producing the result, and but for which such result would not have occurred, amounting, in the view of a court of equity, to fraud in order to save the case from the Statute of Frauds ...
There is no clear and convincing evidence that the conveyance was executed by T.E. Lipe with any understanding, express or implied, that the grantee would hold one-half of the land for the benefit of Roy, nor that Phyllis by any act, word or deed, expressly or impliedly, led the grantors to believe that she would hold the property for the benefit of her brother ...
Lipe v. Souther, 224 Miss. at 483-484, 80 So.2d at 475. We also held that the mere existence of fiduciary or confidential relationships among the parties was insufficient to show fraud or overreaching warranting action by the equity court:
It is the relationship plus the abuse of confidence imposed that authorizes a court of equity to construct a trust for the benefit of the party whose confidence has been abused.
Id. at 484, 80 So.2d 471, citing Summer v. Summer, 224 Miss. 273, 80 So.2d 35 (1955).[7]
In Harris v. Armstrong, 232 Miss. 192, 98 So.2d 463 (1957), we again held that a "merely oral promise" and its breach would not cause a chancery court to declare a trust:
The oral promise, to be pertinent and relevant, must substantially influence and induce the result about which complaint is made. The chancellor, very reasonably, could have found under the testimony in this case, as presumably he did, that the oral promise, such as it was, did not materially aid in inducing, the execution of the deed by Wesley Harris and his wife.
Harris v. Armstrong, 232 Miss. at 197, 98 So.2d at 465-466.
In Moore v. Crump, 84 Miss. 612, 37 So. 109 (1904), we recognized a constructive trust, where evidence showed that a woman had received a deed of land from her father based on her promise to hold the land for benefit of herself and her siblings.
The above cases concern the exception of constructive or resulting trusts from the requirements of § 269 of the Miss.Code (1942), and § 4230 of the Miss.Code of 1892, the predecessors of Miss. Code Ann. (1972) § 91-9-1, which was held to defeat the Droke Family Trust agreement for lack of acknowledgment and recording. In the above cases, we held that a parol constructive trust in land could be recognized, if proven by clear and convincing evidence, and that such constructive trusts would not be invalid under § 269 of the Statute of Frauds.
In the case at bar, there is sufficient proof to recognize a constructive trust arising *369 from the Droke Family Trust agreement and the circumstances surrounding it.[8] First, a "confidential relationship" existed between Dixie and Vernard as husband and wife. Second, an agreement existed between Dixie and Vernard concerning the disposition of their property. Finally, there was a breach of this agreement by Vernard, leading to his unjust enrichment  disposition of the entire marital estate (rather than 1/2 of it) to designees of his choosing.

1. Confidential relationship

In Moore v. Crump, explaining the basis for finding a constructive trust, we stated:
Beyond all doubt but for this promise the deed would never have been made to her, founded as it must have been upon the confidence of the father in the daughter complying therewith. Where the promise is made between the father and child, the moral obligation in strengthened by the existing relation and the confidence which the one would naturally repose in the other.
Moore v. Crump, 84 Miss. at 615, 37 So. 109. A promise made between husband and wife would surely entail a comparable moral obligation.

2. Agreement

Contrary to the chancellor's opinion, the November 18, 1981, wills and the trust instrument are evidence of an agreement between Dixie and Vernard concerning the disposition of their property.
On November 18, 1981, Dixie and Vernard executed the trust instrument, transferring all property they currently held to the trust. The trust was to provide for their mutual support until death. At the same time, Vernard and Dixie signed nearly identical wills, mutual promises to leave all their property to the trust, which would be revocable until the death of either. Further, the trust agreement provided that upon the death of the survivor, the trust would be split into two equal trusts, one for the benefit of Dixie's great grandchildren, and one for the benefit of the church. Witnesses testified that Dixie had expressed concern for her great grandchildren, and wanted to provide for them, and that Vernard expressed a desire that his share go to the church.
The chancellor states that "neither (will) contained any wording to indicate that it was made pursuant to any agreement between Vernard and Dixie Droke." Yet the two wills are identical, except for Vernard's devise of one dollar to his nephew, and Dixie's devise of one dollar each to her daughter and grandson. The wills and the trust agreement were executed the same day, witnessed by the same witnesses, and notarized by the same notary. Moreover, "Item II  Residuary Estate" appears, identically, in both wills. This section reads in part:
All the rest, residue and remainder of my estate, real, personal and mixed, tangible and intangible, of whatever nature and wherever located, I give, devise and bequeath unto the Trustee of the revocable trust created of even date herewith by my wife, Dixie Droke (husband, Vernard Droke), and me as settlors.
(emphasis added). While the two wills do not reference each other, they both reference the trust agreement executed that day. In light of these references, and the nearly identical nature of the wills, we find that the chancellor erred in concluding that neither will indicated an agreement between the Drokes.
The mutuality of promises, symmetry of trust and testamentary arrangements, and the fact that the trust became irrevocable  that is, beyond the reach of the survivor  at the death of either Vernard or Dixie strongly suggest that each party's promise was dependent on the other, and that neither, but for other's identical promise, would have executed the will and trust agreement. Therefore, it may be said that Vernard's promises in his will and the trust agreements "substantially" or "materially" induced Dixie to turn all her property over to the trust, which she believed *370 would ultimately be split between her designee and Vernard's designee. See Harris v. Armstrong and Lipe v. Souther, supra.

Breach
Vernard breached the agreement he had made with Dixie by attempting to revoke the Droke Family Trust after her death. He further breached the agreement by leaving the entire marital estate to his relatives, rather than leaving one-half to his designees, and one-half to Dixie's intended designees, her great-grandchildren.
The evidence in this case rises to the level of "clear and convincing" required to establish a constructive trust. A constructive trust arose from the confidential relationship between Vernard and Dixie, their mutual promises in the wills and the trust agreement, and Vernard's breach of the agreement. Because constructive trusts are exempted from the technical requirements (such as acknowledgment and recording) of Miss. Code Ann. (1972) § 91-9-1, the failure to record the Droke Family Trust agreement is not fatal to the Alvarez parties' claim to the 39.1 acres.
We agree with Alvarez that the chancellor improperly failed to apply equitable principles in this case. We recognize a constructive trust in favor of Dixie's great-grandchildren for one-half of the marital estate.

VI. MR. DROKE'S 1981 WILL BECAME IRREVOCABLE AFTER FULL PERFORMANCE BY MRS. DROKE IN RELIANCE UPON THAT WILL
Alvarez argues that the November 18, 1981, wills executed by Vernard and Dixie were "reciprocal," and that Dixie "fully performed her bargain" with Vernard under their joint testamentary plan by conveying all her property to the trust. Alvarez argues that Vernard's 1981 will became irrevocable, owing to Dixie's full performance in reliance upon it.
Coleman argues that wills are revocable during the life of the maker; that Vernard's 1987 will revoked the 1981 will, and further, that the beneficiary named in Vernard's 1981 will  the trust  was not in existence to receive the property.
The Droke Family Trust Agreement reads in relevant part:
Either of the Settlors may by written instrument, signed, acknowledged and delivered to the co-trustee during that Settlor's life, revoke this agreement in whole or in part and amend it from time to time in any respect except that the duties and compensation of the Co-trustee shall not be materially changed without its written approval. In all other respects, this instrument is revocable and amendable until the death of either of the Settlors, at which time this instrument shall become both irrevocable and unamendable.[9]
We find that Vernard's and Dixie's 1981 wills, taken together with the trust agreement, comprise a reciprocal or mutual will. We have long recognized such wills, noting that the terms "reciprocal will" "mutual will" and "joint will" are used interchangeably:
The textwriters define a mutual will as a will which is executed in pursuance of a compact or agreement between two or more persons to dispose of their property, either to each other, or to third persons in a particular manner. It is said in (97 C.J.S. Wills § 1364):
`Reciprocal wills' are those in which each of two or more testators makes a testamentary disposition in favor of the other or others, under a similar plan, either by executing separate wills or by all uniting in the same will, a will of the latter sort, or one both joint and reciprocal, being sometimes termed a `double' will * * *
*371 Monroe v. Holleman, 185 So.2d 443, 448 (Miss. 1966). In Monroe, a husband and wife executed a joint will, which provided that upon the death of either, the survivor would inherit all property in fee simple. The will stated in part:
It is understood that we hereby mutually agree and contract for the disposition of the estate of us, either of us, it being our expressed intention that the survivor of us shall receive all of our estate without limitations upon his or her use, enjoy, or dispose of the same; however, it further being our expressed intention that whatever of the estate remains after the death of both of us shall pass to our respective families, one-half to each family, as hereinabove provided under Item III.
Monroe, 185 So.2d at 447. After the husband's death, the wife deposited a great deal of the estate assets into accounts she held jointly with her siblings, thereby transferring the residue of the estate to her family alone, rather than allowing for an equal division as provided in the will.
We held that the will was intended to be a contract between the testators for the disposition of their joint estate. The Court held that because the wife had probated the mutual will and taken the benefits under it, she was estopped to repudiate the agreement contained in it. That is, she could not defeat the clear intention of the will by giving a large part of the estate to her family in preference to that of her husband's family. We remanded for an equal division of the estate between the two families. Monroe, 185 So.2d at 448-449.
We noted that a joint will cannot be revoked by the surviving spouse:
(I)f the instrument should be held to be a mutual or even a joint will, it is clear that the surviving testator cannot revoke the will as to the estate belonging to the deceased, which became vested at the death of the testator.
Monroe v. Holleman, 185 So.2d at 448-449, citing Robertson v. Robertson, 94 Miss. 645, 652, 47 So. 675, 676 (1908). See also Asher v. Hart, 212 Miss. 749, 55 So.2d 447 (1951) (mutual will can not be revoked unilaterally, where a survivor has accepted benefits under it).
In Robertson v. Robertson, 94 Miss. 645, 47 So. 675 (1908), a married couple entered into a written agreement, providing that all property then owned by them was theirs jointly; that at the death of either, the survivor would take his or her part of the property for life; and at the death of the survivor, the relatives of each would take one-half of the property. The agreement stated that "this instrument shall operate as a conveyance and as a will." After Mr. Robertson died, Mrs. Robertson attempted to cancel the agreement, so that the entire estate would become vested in her as Mr. Robertson's widow. We rejected Mrs. Robertson's argument that the instrument should be declared simply a will, revocable by Mrs. Robertson's choice. We construed the instrument as "a compact, or perhaps more accurately, a covenant to stand seised to the use of the grantees named," and held that the Mrs. Robertson could not revoke the will as to the estate belonging to Mr. Robertson, which became vested at his death. 94 Miss. at 652, 47 So. at 676.
The wills executed by the Drokes, together with the trust agreement, are properly viewed as a joint, mutual, or reciprocal wills.[10] Dixie and Vernard made mutual, identical dispositions of all their property to the Droke Family Trust. Vernard survived Dixie, and enjoyed the benefits provided by their wills and trust agreement  the unlimited use and enjoyment of all property in the marital estate. As held in the Monroe case, having accepted these benefits, Vernard was estopped from revoking the mutual will, or "estopped to repudiate the contract to leave the residue of their joint estate to be divided equally between their respective (designees)." Monroe v. Holleman, 185 So.2d at 449. As in Monroe, we remand this case for an equal division of the marital estate according to the mutual will and trust agreement.

*372 VII. THE COURT SHOULD HAVE FOUND FOR APPELLANTS ON THEIR CLAIM FOR BREACH OF CONTRACT TO MAKE A WILL
Alvarez argues that Dixie contracted with Vernard to make a testamentary gift to benefit the Church in the amount of 50% of their estate, and that Vernard contracted with Dixie to make a testamentary gift benefitting her great grandchildren in the amount of 50% of their estate. Dixie performed her part of the contract, and the contract became irrevocable at her death; therefore, Vernard was under a legal obligation to comply with the bargain. Alvarez asserts a "third-party claim" on this contract theory. Coleman argues that there is no evidence of a contract between the Drokes.
A contract to devise or bequeath property by will is valid. Williams v. Mason, 556 So.2d 1045, 1048 (Miss. 1990); Trotter v. Trotter, 490 So.2d 827, 830 (Miss. 1986); Estate of McKellar v. Brown, 404 So.2d 550, 552 (Miss. 1981); Monroe v. Holleman, 185 So.2d at 443; Anding v. Davis, 38 Miss. 574 (1860). In Monroe, supra, we discussed the construction of joint wills:
the will of two or more persons executed pursuant to an oral agreement or understanding, may, within itself, when considered and construed together, constitute a contract.
The construction of joint and mutual wills and the contract under which they are made is governed by the rules relating to the construction of wills and contracts generally, including the rule that the situation of the parties and the surrounding circumstances are to be taken into consideration so as to determine the intent of the testators.
Monroe, 185 So.2d at 448. Vernard's and Dixie's wills were clearly executed, together with the trust instrument, pursuant to an agreement or understanding. "Considered and construed together," as directed by Monroe, the instruments "constitute a contract."
We held in Monroe that the surviving wife impermissibly repudiated the contract she and her husband had made concerning the disposition of their property:
Construing the will here involved in the light of the contract which is a part of the will, we are convinced that the surviving testator could not legally give away a great part of the corpus of the estate and thereby defeat the agreement therein contained "that whatever of the estate remains after the death of both of us shall pass to our respective families, one-half to each family * * *"
We are of the opinion that the testimony in this case shows clearly that Maggie Lou Holleman attempted to disregard her agreement by placing a great part of the estate in joint accounts and joint bonds in an effort to transfer the residue of the estate to her own family in preference to an equal division of the residue between their "respective families." Moreover, the persons preferred are persons the testators agreed in their contract in the will should only receive one-half interest in the residue of the estate.
* * * * * *
After having carefully considered the evidence in this case and the terms of the will here involved, we are convinced that the instrument is a mutual and reciprocal will and is contractual in nature. We hold, therefore, that Maggie Lou Holleman was estopped to repudiate the agreement contained in the will, and that she could not defeat the clear intention of the will by giving a large part of the estate to her family in preference to that of her husband's family.
Monroe, 185 So.2d at 448-449.
Vernard, the surviving testator, was similarly bound by the contract contained in the November 18, 1981, wills and trust instrument, and similarly estopped from repudiating that contract. Dixie's half-interest in the marital estate became vested upon her death; Vernard could not thereafter revoke the mutual wills and trust agreement.
In Trotter v. Trotter, we considered the breach of a contract not to revoke a will. We stated that the breach of such contract was not grounds for contesting the will itself, but *373 that the promisor's heirs might have a remedy "on the contract or perhaps upon a constructive trust theory." 490 So.2d at 832. In the case at bar, there was a contract to place all assets in a trust, to give the surviving spouse unlimited use and control over the assets, and to divide the residue of the estate (contained in the trust) at the survivor's death between Vernard's designee, the Church, and Dixie's designee, her great grandchildren. Vernard breached this contract by attempting to transfer the residue of the estate to his designee exclusively. Dixie's great grandchildren may maintain a third party claim on this contract theory.

VIII. THE CHANCELLOR WAS INCORRECT IN HOLDING THE SIX YEAR STATUTE OF LIMITATIONS APPLICABLE TO THE TRUST
Alvarez argues that the chancellor incorrectly applied the six-year general statute of limitations, Miss. Code Ann. (1972) § 15-1-49 to this cause of action, and further erred in holding that the statue of limitations was triggered by Vernard's revocation of the trust instrument on August 12, 1982. Alvarez argues that the chancellor should have applied the ten-year statute of limitation, Miss. Code Ann. (1972) § 15-1-39. Finally, Alvarez argues that because the trust had become irrevocable upon Dixie's death, Vernard's attempted revocation was a nullity; therefore, it could not trigger the running of the statute of limitations.
Coleman argues that the ten-year statute of limitations is applicable only to purely equitable causes of action, and that since Alvarez chose to seek relief on a breach of contract theory, an action at law, the six-year, rather than the ten-year statute applies. Further, Coleman contends that the statute began to run upon Vernard's notice of August 12, 1982, that he was revoking the Trust. Coleman argues that Alvarez took no action concerning the revocation until more than six years later, in October of 1982 when the 1981 will was filed for probate; therefore the statute had run.
Miss. Code Ann. § 15-1-39 (Supp. 1993) provides:
Bills for relief, in case of the existence of a trust not cognizable by the courts of common law and in all other cases not herein provided for, shall be filed within ten years after the cause thereof shall accrue and not after, saving, however, to all persons under disability of infancy or unsoundness of mind, like period of time after such disability shall be removed. However, the saving in favor of persons under disability of unsoundness of mind shall never extend longer than thirty-one years.
Miss. Code Ann. (1972) § 15-1-49 provides:
All actions for which no other period of limitation is prescribed shall be commenced within six years next after the cause of such action accrued, and not after.[11]
Two questions arise under this assignment of error: 1) which statute of limitations applies, and 2) at what point did the statute begin to run.

1) Which statute applies?

Miss. Code Ann. § 15-1-39 applies to either express or constructive trusts. Wholey v. Cal-Maine Foods, Inc., 530 So.2d 136, 139 (Miss. 1988); Thames v. Holcomb, 230 Miss. 387, 395, 92 So.2d 548 (1957).[12] However, the application of § 15-1-39 is limited, in that the cause of action and remedy of the case must be purely and exclusively equitable, or the general six-year statute of limitations will be applied. Wholey v. Cal-Maine Foods, Inc., 530 So.2d at 139.
In Wholey v. Cal-Maine Foods, Inc., 530 So.2d 136 (Miss. 1988), we reversed the dismissal of suits brought by limited partners against the general managing partners for breach of fiduciary duty. The trial court had determined that the limited partners' causes of action were based upon fraud, cognizable *374 by courts of law, and had granted summary judgment for the managing partners on the grounds that the six-year statute of limitations had run. On appeal, we considered whether the actions were in fact based on fraud, cognizable at law, or whether they were purely equitable in nature, thus mandating application of the ten-year statute.
We held that the limited partners' causes of action were based on the breach of fiduciary duties arising from the partnership relation, such breach giving rise to a constructive trust. We stated:
In Stebbins v. Hayes, 379 So.2d 898 (Miss. 1980), this Court looked to the allegation in the complaint in determining that the theory of the case was in the nature of an implied trust or the right to a partnership accounting, so as to mandate the application of the ten-year statute of limitations in § 15-1-39.
Wholey v. Cal-Maine Foods, Inc., 530 So.2d at 140. We held that the ten-year, rather than the six-year statute of limitations should have been applied. See also Patton v. Pinkston, 86 Miss. 651, 38 So. 500 (1905) (where defendant received money from testator during testator's lifetime to invest for testator's benefit, but invested in lands for his own benefit without testator's knowledge, defendant held land in constructive trust for testator's legatees, and suit to enforce the trust would not be barred until ten-year statute of limitations applicable to trusts had fully run).
Alvarez's primary argument in this case  the existence of a constructive trust  is based in equity. Alvarez also argues a breach of contract, the remedy for which would be found at law. However, a plaintiff may plead claims in the alternative; Alvarez's claims for a remedy at law do not preclude his recovery on equitable grounds, if appropriate. The ten-year statute, not the six-year statute, is applicable to Alvarez's claims for equitable relief on the theory of a constructive trust.

2) When does the statute begin to run?

Miss. Code Ann. § 15-1-39 begins to run "from the time the wrong is committed by which the party becomes chargeable by legal implication." Thames v. Holcomb, 230 Miss. at 395, 92 So.2d 548; Cooper v. Cooper, 61 Miss. 676. The repudiation of an implied or constructive trust is not necessary to set the statute of limitation in operation; the statute begins to run in such trust "from the time the act or acts were committed by which the actor becomes chargeable." Thames at 395, Rimmer v. Austin, 191 Miss. 664, 4 So.2d 224 (1941). We stated in Rimmer v. Austin:
in the absence of fraud and concealment, the statute runs from the time when the act was done by which the party became chargeable as trustee by implication, which is to say, from the time when the cestui que trust could have enforced his right by suit. (Implied or constructive trusts) are not created by agreement, nor are they the results of agreement, express or implied; they are products of conduct, in which it is not necessary that the cestui que trust may have had then or theretofore any part or knowledge whatever, but in respect to which the law imputes to the actor then and there an intention, and in consequence the obligation to do equity when called on so to do, and this whether he had any such intention at the time or not.
Rimmer v. Austin, 191 Miss. at 668, 4 So.2d 224. See also Stebbins v. Hayes, 379 So.2d 898 (Miss. 1980) (right to enforce constructive trust "accrues at the time of performance of the act from which the trust results"). The question, therefore, is what act gave rise to the trust, or at what point did Vernard become "chargeable as trustee by implication."
Arguably, this moment occurred at Dixie's death on May 29, 1982, when the Droke Family Trust agreement would have become irrevocable, had it been effective. At that point, Vernard took exclusive possession of the entire marital estate, for his unlimited use and enjoyment. He may fairly be said to have held half of the marital estate in constructive trust for Dixie's designees. Alvarez filed his claims on December 4, 1989, within ten years of the accrual of this cause of action.
Alternatively, the date of accrual of this cause of action may be considered August 12, 1982, when Vernard sent his revocation letter *375 to Alvarez. This letter put Alvarez on notice that Vernard did not intend to carry out the terms of the trust. That is, the cause of action arguably did not accrue until Alvarez had reason to know of Vernard intent not to comply with the joint testamentary plan. At any rate, Alvarez filed his claim in a court of equity within the ten year statutory period of Miss. Code Ann. (1972) § 15-1-39.
As for Alvarez's non-equitable claims  that is, the third party claims on a breach of contract theory  the six year statute of limitations is applicable. We agree with Alvarez that such statute would not begin to run until Vernard's death, since the contract to make a will could not be breached until the party obliged to make the will died without performing. We find that the statutory period began to run on October 29, 1988, and that Alvarez's contract claims were timely filed.

CONCLUSION
While the Droke Family Trust agreement lacked proper acknowledgment and recording, such requirements are inapplicable to constructive trusts under Miss. Code Ann. (1972) § 91-1-1. A constructive trust arose from the confidential relationship between Dixie and Vernard, and the breach of their joint testamentary agreement after her death. Such constructive trust is recognized in favor of Dixie's great-grandchildren for one-half of the marital estate. The 1981 wills and trust instrument executed by Vernard and Dixie constituted joint, mutual, or reciprocal wills; having enjoyed the benefits thereunder, Vernard was estopped from revoking the will after Dixie's death. Vernard was bound by the contract contained in the wills and trust agreement; Dixie's great-grandchildren have a third party claim based on Vernard's breach of contract. The ten year statute of limitations, Miss. Code Ann. § 15-1-39 (Supp. 1993) applies to Alvarez's claims under a constructive trust theory, as the cause of action and remedy lie in equity. The claims were filed within the statutory period, whether the cause of action accrued at Dixie's death, or upon Vernard's attempted revocation. The contract claims were also timely filed, as the statutory period did not begin to run until Vernard's death.
The Alvarez parties prevail under both contract and constructive trust theories. We reverse and remand this case for an equal division of the marital estate according to the Trust agreement.
REVERSED AND REMANDED.
HAWKINS, C.J., DAN M. LEE and PRATHER, P.JJ., and SULLIVAN, PITTMAN, BANKS, McRAE and SMITH, JJ., concur.
NOTES
[1] In the body of the trust agreement Dixie and Vernard conveyed "the property and income interest described in Schedule A hereto attached." Schedule A provided for the conveyance of "all rights, all funds and all property, both real and personal, whatever situated owned by the settlors and all interests, powers and choses in action residing in the Settlors as of this date."
[2] Beverly was bequeathed Vernard's house and its three acres.
[3] Andrea had reached majority; Brian was still a minor and was represented through his father.
[4] The Third-Party Complaint by the Alvarez parties named the Estate of Vernard Droke as Third-Party defendant; the claim was for breach of the contract between Dixie and Vernard concerning their mutual wills. Vernard's revocation of his 1981 will was identified as the breach. The Alvarez parties claim for damages against the estate was the amount equal to the value of property owned by Vernard and Dixie on November 18, 1981, plus interest from the date of Vernard's death.
[5] Ann stated that Purple was from Memphis, and was licensed in Tennessee.
[6] The Church is not a party to this appeal.
[7] See also Section 44 of the Restatement of Trusts.
[8] The evidence in the case at bar is at least as persuasive as that held adequate in Lipe v. Souther and Moore v. Crump. In those cases, an oral promise was held sufficient to establish a constructive trust, given the proper proof. In the case at bar, there are in evidence documents executed and signed before a notary, demonstrating an intent to establish a trust.
[9] This paragraph appears to offer a contradiction. The first statement provides that Dixie or Vernard could revoke or amend the trust agreement "during that Settlor's life," without restriction concerning the death of the other. However, the last sentence provides that the trust would become irrevocable after the death of either. These provisions may be harmonized by reading the last sentence as controlling the exercise of power described in the first. Moreover, this interpretation of the trust instrument is supported by testimony that the Drokes' lawyer explained to them that the trust would be revocable until the death of either, and then become irrevocable.
[10] Reciprocal wills may consist of more than one document. See 97 C.J.S. Wills § 1364, cited in Monroe v. Holleman, 185 So.2d 443 (Miss. 1966).
[11] This statute was amended in 1989 to provide a three year statute of limitations, applying to causes of action accruing on or after July 1, 1989.
[12] In Thames v. Holcomb, the Court considered the application of Section 746 of the 1942 Miss. Code, which is nearly identical to Miss. Code Ann. (1972) § 15-1-39, under consideration in this case.