PITCHFORD v. HOWARD, et al.

In Banc.   Mar. 13, 1950.

No. 37421 (45 So. (2d) 142)

J. Ed. Franklin, and L. F. Easterling, for appellant.

Jackson, Young, Daniel & Mitchell, for appellees.

**J. Ed. Franklin** and **L. F. Easterling**, in reply.

**Smith, J.**

This is an appeal from the Chancery Court of the First Judicial District of Hinds County, involving a transaction concerning a house and lot in the City of Jackson conveyed to Mr. Howard by Mrs. Pitchford, to be reconveyed to her by him later, upon compliance with the terms and purpose of an oral agreement to that end. For convenience, we will refer to the actors by name, since Mrs. Howard seems to have been more or less inactive in promoting the compact.

Mrs. Pitchford filed her original bill with certain specific alternate prayers. 1st, that her deed to Mr. Howard, which was dated October 17, 1947, be held to have been procured by fraud, and that as a result of such fraud a constructive trust arose in her favor, and that Mr. Howard holds the title to the property in trust for her, and he and his wife, Mrs. Helen E. Howard, be required to reconvey it to her by a valid deed, or upon their failure to do so, that a Commissioner of the Court be appointed to do so; 2nd, in the alternative, if it be held that there was no such constructive trust, that the court hold that said deed was obtained by fraud and deceit, rendering it null and void, and the same be cancelled, and the title to the property quieted and confirmed as against Mr. and Mrs. Howard; 3rd, or in the alternative, if the court hold against both the foregoing prayers, then that the court render a decree against them for the full value of the property less the amount of the deed of trust, $4,500, executed by Mr. and Mrs. Howard to the Liberty National Life Insurance Company, less any payments thereon, less the sum of $1,380.88 received by Mrs. Pitchford out of said loan, less the legitimate expense of closing the same with the said insurance company; 4th, and if not entitled to this alternative relief, that the court hold that $3,500 was not paid her, and is still owing to her, and a lien be fixed on the property for said amount, and if not paid within a reasonable time a

Court Commissioner sell it " to satisfy either of said alternatives found".

Mr. and Mrs. Howard filed a so-called special and a general demurrer to the original bill. The special demurrer was grounded upon complaint that the relief sought by the first prayer of Mrs. Pitchford is an attempt to enforce a constructive trust in lands created solely by an oral agreement, in violation of the Statute of Frauds, Code 1942, Section 264, and Section 269, Code 1942, said oral agreement being void and unenforceable; she is not entitled to the relief sought by the first alternative prayer, because she has "elected to affirm the agreement allegedly obtained by fraud", nor has she offered to restore them to status quo as required before rescission may be allowed; she is not entitled to the second alternative prayer because "said prayer is foreign to the facts set forth in complainant's bill of complaint, which facts affirmatively show that there was never any agreement or intention on the part of either complainant or defendant that defendants should pay to complainant the additional sum of $3,500.00, or any other amount to perfect defendant's title to the property in dispute."

The grounds of the general demurrer were that there is no equity on the face of the bill; that Mrs. Pitchford does not come into court with clean hands; and that the averments of her bill show that the situation developed from her effort to cheat and defraud the Liberty National Life Insurance Company of $4,500 under the false pretense that defendant H. H. Howard was the owner of the property, in violation of public policy and Section 2149, Code 1942, with the result that H. H. Howard and Mrs. Pitchford were in pari delicto and she is, therefore, entitled to no relief.

The Chancellor rendered two opinions, one dated October 21, 1948, and the other January 28, 1949. In the former he upheld the contention of Mr. and Mrs. Howard that he and Mrs. Pitchford were in pari delicto, and she did not come into court with clean hands, and that the

transaction was within the inhibition of the third section of the Statute of Frauds. The demurrers were sustained. The order thereon contained this provision: "Demurrers should be sustained, and Bill dismissed, since the nature of the case admits of no amendment if a substantial restatement of it is the controlling element of the litigation. And ordered."

In the later opinion, the Chancellor held there was no semblance of a constructive trust, nothing to result by implication or operation of law in favor of Mrs. Pitchford, stating that "The bill narrates in detail a complete oral and express agreement between the parties, even to the consideration to be paid the Defendant for carrying out the alleged 'scheme' to obtain the money, and reconvey the property to complainant". The demurrers were again sustained. The Bill was dismissed, with decree accordingly, after Mrs. Pitchford filed a written motion for leave to file either an amended or supplemental bill, or to amend the original bill, which motion was overruled.

It is, of course, necessary to set out a summary of the pertinent and salient portions of the allegations of the bill bearing upon the rulings of the Chancellor on the demurrers, which admit the facts well pleaded.

Mrs. Pitchford was a widow. She had bought the property involved about a year before the events chronicled in the original bill. The purchase price was $8,200 of which she paid $5,000 in cash, and assumed a debt secured by a trust deed thereon in favor of a bank in the City of Jackson. She had reduced this assumed debt substantially when the occurrences in the litigation had their inception. The amount was repayable in monthly installments. She moved to Jackson from Tchula, and was occupying the property involved as her home. Her acquaintance with Mr. Howard began with an automobile purchase from him by Mrs. Pitchford, leading to frequent dealings with him in servicing her car. Out of this association grew a close

friendship, frequent visits to her home in Jackson by Mr. Howard, where he was treated almost as a member of the family, resulting in her reposing trust and confidence in him.

Learning of Mrs. Pitchford's intention to return to Tchula, after about a year's residence in Jackson, Mr. Howard inquired if she intended to sell or rent her Jackson home, and was informed she had tried to sell it, and failed but that she did not intend to rent it. Whereupon Mr. Howard began to importune her to rent the property to him for the monthly payments due the bank in Jackson, offering to keep it in good repair, and pay the taxes until Mrs. Pitchford should sell or request repossession. Because of the family association and her implicit confidence in him she finally was persuaded to rent the property to Mr. Howard on his suggested terms. She returned to Tchula on June 2, 1947, and Mr. and Mrs. Howard moved into the Jackson property.

A few months later Mrs. Pitchford decided to purchase a home in Tchula, for which she needed more cash than she possessed, and so she sought an additional loan from the bank holding the trust deed already on the property, of which only about $2,600 was unpaid at the time; and from other lending agencies in Jackson, but was refused because she did not reside in Jackson. She also tried to borrow the money from Tchula banks, but failed because the banks there did not lend money on Jackson property.

On one of Mrs. Pitchford's visits to Jackson, for the purpose of effecting the loan, if possible, Mr. Howard inquired as to her business there. She told him that she was in the city in order to obtain an additional or increased loan on her house he was occupying, and he inquired further if she were having any success. She replied she had not but was still trying. Mr. Howard then said to her, "I will be where I can help you", stating also that he had a good credit rating in Jackson and was in business for himself. He then and there pro-

posed that Mrs. Pitchford deed the property to him; he would obtain a loan sufficient to pay the trust deed to the bank in Jackson and to give her the extra funds she required; and that after the loan had been secured he and Mrs. Howard would reconvey the property to her. For this use of his credit and his services he was to be paid $100. At first Mrs. Pitchford declined his proposal, saying she would think about it, and give him a final answer later. After the lapse of about a week, not having heard from Mrs. Pitchford, Mr. Howard, his business associate with the latter's wife, and another man, drove to her home in Tchula seeking her decision. She still put him off but promised to let him hear from her in a few days. Upon the departure of Mr. Howard and his companions, Mrs. Pitchford conferred with her mother and brother, acquainting them with his proposal. Because of the manifested friendship and confidential relations between Mr. Howard and herself and family, shared by her mother and brother, she decided to accept Mr. Howard's offer of assistance.

Mrs. Pitchford then returned to Jackson, and advised Mr. Howard of her conclusion, which pleased him, she averred. He said he would undertake to obtain the loan for the full loan value of her property, and that he would inform the loan company he was purchasing the property for $3,500 and was obtaining the loan to pay off the indebtedness to the bank and the remainder was to be paid to Mrs. Pitchford. He tried to secure from Mrs. Pitchford a receipt for $3,500, which she declined to give him. After about another week Mr. Howard telephoned her to come to Jackson, that he was ready to close the loan, which was done in the office of a local real estate agent. At the request of Mr. Howard she signed the deed to him, and he and Mrs. Howard thereupon executed the papers perfecting a trust deed to the Liberty National Life Insurance Company, which was on October 17, 1947. When the loan was closed a check was given Mrs. Pitchford in the amount of $1,033.13, which she cashed, and

also deposited another and smaller check for $347.75 in a bank to her credit. The bill also alleges that she received only this $1,380.88, which was not the full difference between the newly negotiated loan and the former trust deed to the bank in Jackson. This was because Mr. Howard had not made the monthly payments to the bank in accordance with his rental contract with Mrs. Pitchford, which, had he done so, would have reduced the loan at the bank to approximately $2,600, entitling her to about $1,750, instead of the $1,380.88 she was given.

After the details, as stated, had ended, Mr. Howard was to have brought the executed reconveyance to Mrs. Pitchford at a certain cafe in Jackson. He came, but failed to bring the deed on the excuse that his wife had been suddenly taken ill. He told Mrs. Pitchford to return to her home in Tchula, and he would mail it to her in a few days, and, still believing in his honesty and integrity, she adopted his suggestion, but not before she was required to pay him $100 in cash in addition to cancelling a personal debt from him to her, making a total of $200 Mrs. Pitchford paid Mr. Howard for use of his credit and assistance in effectuating the loan.

Some time passed, and the deed was not forthcoming, so she and her brother returned to Jackson, and demanded the deed of reconveyance. This time, Mr. Howard's excuse for non-compliance was that he lacked the money to pay the fee of an attorney for drafting it, whereupon Mrs. Pitchford offered to pay the charge of any attorney he might select for this service. Mr. Howard evaded the proffer, but offered to give her a trust deed on the property for $3,500. This, Mrs. Pitchford rejected,—demanding a deed, which she did not get.

Upon returning to Tchula, and still not receiving any deed of reconveyance, she wrote to Mr. Howard and threatened suit. His silence continuing, she came again to Jackson to see him, who then demanded to know if she thought he was trying to beat her out of her property,

she replying it had the appearance of it. After repeated interviews with him, and continued inability to secure the deed, Mr. Howard finally told Mrs. Pitchford that while he was willing to give the deed to her, he could not because Mrs. Howard refused to sign it.

The bill further avers that so far as she knew the Insurance Company acted in good faith in making the loan for $4,500 on property worth twice that amount, and that it was not her intention to molest or disturb that loan on the property, but her sole purpose and desire was to have her reconveyance and the amounts of rent collected from her property and retained by Mr. Howard.

The bill then goes into detail as to the rents, and its averments conclude with the charge that Mr. Howard concocted a scheme to cheat and defraud her out of her property, by the artifice of securing a deed thereto from her, in connection with the negotiation of the new loan thereon.

It will be seen from the averments of facts in the original bill, supra, and the demurrers thereto, and the ruling of the Chancellor thereon, that two main questions present themselves for decision: (1) Was it error for the Chancellor to sustain the demurrers, in the first place? (2) If not, was it then error for him to deny Mrs. Pitchford the right to file an amended or supplemental bill, or to amend the original bill? If the first question is to be answered in the affirmative, we do not reach the second. This, therefore, brings before us the issue of constructive trust vel non, and if we decide that a constructive trust arose out of the circumstances and conduct of Mr. Howard as alleged in the original bill, then the question is whether there was fraud against the Liberty National Life Insurance Company in obtaining the loan from it, and if so, whether both parties were in pari delicto in that behalf.

We will discuss the latter first, since the Liberty National Life Insurance Company obviously was the object

of the fraud, if fraud there were, according to Mr. Howard's own contention. In his general demurrer, the third ground thereof, he argues, and we quote: "That the bill of complaint affirmatively shows that the situation of which complainant complains is a result of an effort on complainant's part to designedly cheat and defraud the Liberty National Life Insurance Company of $4,500.00 under the false pretense that defendant H. H. Howard was the owner of the property in dispute, all in violation of public policy and Section 2149, Mississippi Code of 1942. That complainant and defendant H. H. Howard are, therefore, affirmatively shown to be in pari delicto and complainant is entitled to no relief."

Whatever else his demurrer may do, it declares that Mr. Howard himself was "in delicto". But, as may be noted by reference to the original bill, Mrs. Pitchford asserted therein specifically that she had no intention or purpose to molest or disturb this loan upon her property, which was worth twice its amount. All of this the demurrers admit, and the argument in them to the contrary is nowhere supported by any allegations in the original bill. Furthermore, the prayer of the original bill demonstrates Mrs. Pitchford's concern for the Liberty National Life Insurance Company, and reveals a special purpose that its loan result in no loss to it. The Insurance Company is not complaining, so far as this record reflects. How could it be true that Mrs. Pitchford's intention was to defraud the Insurance Company, moreover, when she arranged ample security for it, from a first lien on property worth twice the amount of the loan, together with whatever additional security came from the signatures of Mr. and Mrs. Howard to the loan papers? There is no pretense (and can reasonably be none) that Mr. and Mrs. Howard were defrauded. He was paid $200 for his services and aid in negotiating the loan, including the value of his credit in that regard. They were not cheated and defrauded, which leaves only Mrs. Pitchford, and certainly she was cheated and de-

frauded, but not by herself. Mr. Howard initiated every step and persisted in every progress of what took place until he accomplished his purpose. But even he did not cheat and defraud the Liberty National Life Insurance Company. The worst that can possibly be said about the arrangement with the Life Insurance Company is that it was not according to established usage. However, there was no moral turpitude involved, and, as stated, the Insurance Company was not harmed by making the loan. No one, except Mrs. Pitchford, was defrauded thereby, and this was at the sole instance of Mr. Howard, the moving spirit in it all. In Meador v. Hotel Grover et al., 193 Miss. 392, 9 So. (2d) 782, we pointed out that before one can be held to be in pari delicto with another, he must first be in delicto. Before the parties hereto could have been "in delicto", as regards the Liberty National Life Insurance Company, there must have been a purpose to cheat and defraud it, a device adapted to the accomplishment of such purpose, and a course of conduct resulting in the cheating and defrauding of the Company. None of those elements appear in the record before us. There are only the averments of the original bill as to Mr. Howard's cheating and defrauding Mrs. Pitchford. As to that, the record is sufficient, by the aforesaid averments and the demurrers admitting the same.

We find this was held by the Kansas City Court of Appeals, Missouri: Where one party acts at instance of another in whom he has confidence and trust, parties not in pari delicto, and doctrine that one who seeks equity must have clean hands does not apply. Harrety v. Kontos, 238 Mo. App., 519, 184 S. W. (2d) 195, 198.

Without further belaboring the matter, we have concluded that the Chancellor was in error in sustaining the demurrers on the doctrine, "in pari delicto". This brings us to the next question,—did a constructive trust arise here, whereby Mr. Howard should be held to

be the trustee of Mrs. Pitchford, and required to reconvey to her the property involved, subject to the trust deed to the Life Insurance Company, and as affected by certain other items set out in her bill of complaint?

Section 269, Code 1942, deals with trusts and confidence. It provides that, after its adoption, all declarations or creations of trusts in land shall be written, signed by the declarant or creator, or by his last will, in writing; or they shall be void. It also provides for acknowledgment and recordation, and limits effectiveness from and after the date of filing for record, but it concludes as follows: "but where any trust shall arise or result, by implication of law, out of a conveyance of land, such trust or confidence shall be of the like force and effect the same as it would have been if this statute had not been passed."

In discussing this statute, we have held that upon refusal of a devisee to carry out an oral agreement to hold property for others a trust was created. This was a case where one of several persons to whom a testator designed to leave his property was influential in inducing him to devise his entire estate to her, promising to convey a share to each of the others. She was, as stated, adjudged to hold the property in trust and required to effectuate the disposition intended by the testator. Benbrook et al. v. Yancy, 96 Miss. 536, 51 So. 461.

It must be borne in mind that Mr. Howard was the moving agent throughout all of the transactions and events of this case. He imposed upon Mrs. Pitchford's trust and confidence in him to persuade her to let him, after much persistence on his part, after overcoming her reluctance, use her property on which to raise money to pay off a trust deed to a bank in Jackson in order to clear the title to the land from that encumbrance, and to borrow money on the property by means of which he enabled himself to get a deed from her to it, with the result that he had obtained her property at what will be a net gain to him of approximately forty-five hundred dollars, since the property is worth approximately nine thousand dol-

lars, and as a further result she obtained in actual cash only about thirteen hundred dollars, although she had made an initial payment of $5,000 down on the purchase price when she acquired it. The inescapable influence from the allegations of the original bill in this case is that the imposition upon Mrs. Pitchford's trust and confidence was conceived in Mr. Howard's personal avarice and as a scheme and device to accomplish the result he brought about, to enrich himself at her expense.

In Rance v. Gaddis et al., 226 Iowa 531, 284 N. W. 468, 474, the Supreme Court of Iowa said that: "The general rule is that fraud in the procurement of any written instrument vitiates it in the hands of one seeking to benefit thereby, and it is a familiar rule that fraud vitiates every transaction in which it enters, and that equity will interpose to prevent that which, if allowed, would work a manifest fraud, and it is unnecessary to cite authorities in support of these fundamental propositions. It is also true that equity will construct a trust where one, through actual fraud, abuse of confidence, or questionable means, gains something which in equity and good conscience he should not be permitted to hold."

The subject of constructive trusts is intimately associated with that of fraud. "Rightly understood ▇▇ a 'constructive trust' is only a mode by which courts of equity work out equity and prevent or circumvent fraud and overreaching." 2 Words & Phrases, 1st Series, page 1477; 8 Words and Phrases, Perm. Ed., page 857.

Section 1 e, Restatement of the Law, Trusts, reads: "A constructive trust is a relationship with respect to property, subjecting the person by whom the title to the property is held to an equitable duty to convey it to another on the ground that his acquisition or retention of the property is wrongful and that he would be unjustly enriched if he were permitted to retain the property." Section 44, of the same treatise, announces the rule to be further that "(1) Where the owner of an interest in land transfers it inter vivos to another in trust for the transfer-

or, but no memorandum properly evidencing the intention to create a trust is signed, and the transferee refuses to perform the trust, the transferee holds the interest upon a constructive trust for the transferor, if (a) the transfer was procured by fraud, duress, undue influence, or mistake, or (b) the transferee at the time of the transfer was in a confidential relation to the transferor.'' Subsection 1(a) of Section 44, of the same work, is authority for an adjudication that the situation before us is a constructive trust, despite the fact that there is also involved a breach of promise by Mr. Howard to reconvey.

The Florida court held that equity raises constructive trust and compels restoration, where by fraud, abusing confidence, or other questionable means, one gains something which in equity and good conscience he should not keep. Quinn et al. v. Phipps, 93 Fla. 805, 113 So. 419, 54 A. L. R. 1173. In Moore et al. v. Crump et al., 84 Miss. 612, 37 So. 109, we declared the doctrine to be well established and well recognized that ██ ''where a grantee or devisee obtains the possession and title to land intended for another by actual fraud, on proof of the fraud a trust will be raised in favor of the latter, and that the trust may be established by parol.''

In Adcock et al. v. Merchants & Manufacturers Bank of Ellisville, Miss., 42 So. (2d) 427, 430, we quoted with approval this text from 54 Am. Jur., page 179, Section 234: ''Active conduct on the part of the grantee to bring about the conveyance, especially where there is a fiduciary or confidential relationship between him and the grantor, and the grantee's subsequent failure to carry out his agreement or promise to hold in trust for reconveyance, tend to show fraud or bad faith on the part of the grantee, so as to raise a constructive trust.'' We think the Adcock case is directly in point here.

██ From the allegations of the bill, and upon the authorities cited, we are of the opinion that a constructive trust arose from the conduct of Mr. Howard, and that he holds this property as trustee, ex maleficio, for

Mrs. Pitchford, subject to the lien of the Liberty National Life Insurance Company, and the Chancellor was in error in sustaining the demurrers, on the argument in opposition to this view. We find nothing in the authorities cited by appellee that, in our judgment, refutes our conclusion in the premises.

This is not a suit merely to enforce performance of an oral contract to convey land. It is, moreover, a suit to establish a constructive trust under the statute on Trusts and Confidence, as to which, the statute itself provides, that a constructive trust can arise although some of its phases may rest in parol. The violation of the agreement to reconvey was but the last link in the chain by which Mr. Howard bound Mrs. Pitchford to her hurt and injury. It was merely the completion of his course of conduct, which made him the trustee, ex maleficio, of Mrs. Pitchford. See Sample et al. v. Romine, 193 Miss. 706, 8 So. (2d) 257, 262, 9 So. (2d) 643, 10 So. (2d) 346, where we stated: "The trust arises and results by operation of law from the facts and circumstances attending the transaction and the relation of the parties. This is true even though as a part of the original understanding it was orally agreed title should be taken in one of the parties, if there are other facts and circumstances surrounding the transaction which cause a trust to result. (Page 373, Sec. 50) 65 C. J., supra. As was said in Thomas et al. v. Thomas, 62 Miss. 531: 'It is well settled by authority that where, on the facts proved, a trust would result in the absence of an express agreement, the fact that such agreement was made will not prevent the trust from arising'."

Mrs. Howard had no estate in this property, her connection with signing the instruments being limited to that of a wife with her husband in such matters.

We have discussed only the prayer in the original bill regarding a constructive trust, because that is the only one of the prayers that is argued here. However, it is not to be assumed that we thereby preclude appellant

from seeking relief also on any of her other alternative prayers, none of them adversely affecting the rights of the Liberty National Life Insurance Company.

Other phases of the litigation, such as accounting for rentals, reductions, and similar things, do not here concern us on the issues raised by the assignment of errors, and the arguments in the briefs of counsel. Neither do we reach the question of whether appellants should have been permitted to amend, since we hold the demurrers should have been overruled.

The decree of the Chancery Court is, therefore, reversed because of the errors in sustaining the demurrers and dismissing the bill, and the cause remanded for trial on pleadings and proof.

Reversed and remanded.