## IN THE SUPREME COURT OF MISSISSIPPI
### NO. 96-CA-00922-SCT

*CHURCH OF GOD PENTECOSTAL, INC.*

*v.*

*FREEWILL PENTECOSTAL CHURCH OF GOD, INC.*

| | |
|---|---|
| DATE OF JUDGMENT: | 07/22/96 |
| TRIAL JUDGE: | HON. GLENN BARLOW |
| COURT FROM WHICH APPEALED: | JACKSON COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | GARY L. ROBERTS |
| ATTORNEY FOR APPELLEE: | G. CHARLES BORDIS, IV |
| NATURE OF THE CASE: | CIVIL - REAL PROPERTY |
| DISPOSITION: | AFFIRMED - 6/4/98 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 6/25/98 |

**BEFORE PITTMAN, P.J., BANKS AND WALLER, JJ.**

**WALLER, JUSTICE, FOR THE COURT:**

### SUMMARY

¶1. Church of God Pentecostal, the Appellant, sued Freewill Pentecostal Church, the Appellee, for injunctive relief, accounting and to quiet title to certain property on which a church is situated. The minister of Freewill Pentecostal, Floyd Langer, was at some point, a Trustee, Overseer, and Bishop with the Church of God Pentecostal who was defrocked for reasons unclear in the record. However, Langer and the majority of his congregation continued to use the property for church services. Church of God Pentecostal, the putative parent denomination, argued that it was the rightful owner of the property and Langer and Freewill Pentecostal Church were no longer recognized as part of the national organization and, therefore, not entitled to possession, use, or enjoyment of the property. The chancellor found in favor of Freewill Pentecostal Church. Aggrieved by the chancellor's decision, Church of God Pentecostal assigns the following as error:

> **I. THE TRIAL COURT WAS MANIFESTLY IN ERROR AND ABUSED ITS DISCRETION BY CONFIRMING TITLE IN FAVOR OF FREEWILL PENTECOSTAL CHURCH, RATHER THAN IN FAVOR OF CHURCH OF GOD**

PENTECOSTAL.

**II. THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN REFUSING TO ADMIT INTO THE RECORD CERTAIN TESTIMONY UNDER RULE 406 OF THE MISSISSIPPI RULES OF EVIDENCE.**

After careful review of the record and briefs in this matter, this Court holds that the chancellor did not abuse his discretion as to either assignment of error and, as such, affirms the chancellor's decision.

## STATEMENT OF THE FACTS AND PROCEDURAL HISTORY[(1)]

¶2. This action was initially filed by the Church of God Pentecostal, Inc., an Alabama corporation ("Pentecostal"), against Floyd Langer ("Langer"), James Armstrong and Betty Armstrong. James Armstrong, Betty Armstrong and Langer filed a Motion to Dismiss and, by order of the Chancery Court of Jackson County, were dismissed as party defendants. Pentecostal then filed a Motion to Amend the Complaint to join other defendants and by order of said chancery court, on July 6, 1995, Pentecostal was allowed to amend the complaint. The Amended Complaint named as defendants Langer, Freewill Pentecostal Church of God ("Freewill"), and Magnolia Federal Bank for Savings ("Magnolia"). On November 10, 1995, a Stipulation and Order was filed which recognized that Magnolia held a good and valid first lien on the realty which is the subject of the case *sub judice*. As such, Magnolia was not required to be an active participant in the trial. By order of April 8, 1996, Langer was dismissed as a party defendant. The remaining parties, Pentecostal and Freewill, carried forward with the instant litigation.

¶3. Pentecostal is a national church with its headquarters in Pritchard, Alabama. The Chief Apostle and head of Pentecostal is Bishop E.D. Davis ("Davis"). Pentecostal has been chartered in the state of Mississippi since 1993 and has had by-laws in effect since 1961. According to Davis, Pentecostal had by-laws in effect since the 40s when the denomination was first begun in Arkansas. However, when Pentecostal was incorporated in Alabama in 1961, the by-laws evidently came into print. Pentecostal claims to be the owner of certain church property located in Moss Point, Mississippi, by way of four deeds, which were attached to Pentecostal's complaint and made exhibits at trial. Pentecostal claims the realty was secured by the local congregation for Pentecostal and cites its by-laws as support. Freewill is a local church in Moss Point, Mississippi, and claims ownership of the subject realty, asserting that the deeds convey the realty to the trustees of the Moss Point Church for the use of its membership.

¶4. The first deed, which purports to convey Lot 16 in Block 1 of Gautier's First Addition to Moss Point, Mississippi Subdivision, was executed on July 28, 1959. The grantors, Henry Brown and Clara Brown "sold" the above described realty to CHURCH OF GOD PENTECOSTAL, GENERAL ASSEMBLY. Prior to July 28, 1958, several local people in Moss Point had been gathering for religious services. These individuals, according to the testimony of Mr. J.C. Mason, Mr. W.C. Johnson, and Mr. D.W. Millender, who were among those individuals, were not affiliated with any church or national organization. Testimony indicated that various preachers traveled to Moss Point to conduct street services. Manley Hughes testified as a witness for Pentecostal, that had, on occasion, held street services for the folks in Moss Point. Hughes did not pastor a church and stated that he had held services in other places like he did in Moss Point.

¶5. The above described property was purchased for $500 on July 29, 1958. The purchase price was earned by the selling of fish sandwiches, box dinners, and barbeques, all of which, according to testimony, were conducted by the local people in Moss Point. Pentecostal produced no evidence which would support its contention that it contributed to the purchase price for the above described property. Testimony showed that subsequent to the purchase of the property, the Moss Point folk gathered their labor and resources and constructed a building on the property in which their religious services were held. W.C. Johnson and D.W. Millender, called as witnesses for Pentecostal, testified that it was their understanding that the church and the property belonged to the local people in Moss Point.

¶6. In May, 1968, a second deed was executed which purported to convey the East 40' of Lots 14 and 15, Block 1, Gautier's First Addition to Moss Point. The grantors were Jim and Martha Brooks, and the grantee in this deed was the CHURCH OF GOD PENTECOSTAL OF MOSS POINT, MISSISSIPPI. Testimony at trial evinced that the funds for the purchase of this second piece of realty were again raised by the local people of Moss Point.

¶7. Subsequent to 1968, the members of the local Moss Point congregation were under the direction of James Armstrong. According to Armstrong's testimony, the local congregation constructed the church, which is located on Lot 16, Block 1, Gautier's First Addition. Testimony revealed that the building was constructed without any assistance, financial or otherwise, from Pentecostal.

¶8. In May of 1976, the people of the Moss Point congregation sought legal advice from the late Frank Hammonds, a local attorney, regarding the realty. On June 3, 1976, a deed was prepared which made every effort to comport with state laws regarding ownership of realty by unincorporated religious societies. This deed conveyed certain realty to J.C. MASON, O.B. SIMMS, AND JAMES ARMSTRONG AS TRUSTEES OF THE CHURCH OF GOD PENTECOSTAL OF MOSS POINT.

¶9. In 1986, the Moss Point congregation was extended a $5,000 loan by Pentecostal. The loan was paid off within 90 days. Pentecostal was not paid and did not ask for interest on the loan.

¶10. The members of Moss Point were able to acquire Lot 15, Block 1, Gautier's Addition, less the East 40' by way of Commissioner's deed on October, 26, 1993. This piece of realty was obtained by the Moss Point congregation's paying taxes on the property for many years and by clearing the lot of debris and garbage. Initially, the Church of God Pentecostal was given lien against the realty, which was later foreclosed upon judicially.

¶11. At some point, the date being unclear in the record, the local congregation executed a Deed of Trust in favor of Magnolia. They have made each and every payment as it has come due without any assistance from Pentecostal. Testimony at trial revealed that neither Pentecostal, nor its Chief Apostle, Davis, was aware of the Deed of Trust until "recently." The testimony of Davis, the Chief Apostle, was confused, as he is in his eighties and had a series of strokes prior to the trial which was held in April of 1996.

¶12. In March, 1994, Langer was defrocked by Pentecostal for what Pentecostal's complaint characterizes as misconduct and failure to act in accordance with the By-Laws of Pentecostal. Langer had come to Moss Point in 1953. He held the title of Bishop in Pentecostal and, at one point in time,

was a trustee for Pentecostal. Additionally, he was an original incorporator of Pentecostal in 1961 and was Pentecostal's State Bishop of Mississippi. Prior to Langer's being defrocked by Pentecostal, the relationship between Pentecostal and the Moss Point congregation had been "a good one." Langer's being defrocked resulted in the Moss Point congregation's changing the locks on the building, which was characterized by Armstrong's testimony as being done for insurance purposes. Prior to Langer's being defrocked, the Moss Point church had a sign in front of the building which stated "Church of God Pentecostal, Inc., Langer, Bishop, E.D. Davis Bishop." Following this "falling out" the sign was changed to "Freewill Pentecostal Church of God" and Davis' name was deleted. Pentecostal's complaint alleges that, in November, 1994, the former trustees of the Church of God Pentecostal, Inc., and the subordinate/church located in Moss Point, Mississippi, attempted to convey the realty in question to the "newly" formed Freewill Pentecostal Church.

¶13. On June 13, 1996, the chancellor filed his Ruling and Opinion of the Court, with the Judgment being filed on July 22, 1996, confirming title in the subject realty in Freewill. The chancellor found that the 1958, root deed was ambiguous and, on the basis of the surrounding facts and circumstances, including the finding that the deed pre-dated Pentecostal's by-laws and that Pentecostal was not chartered in Mississippi until 1993, ruled that the intent of the parties was that the property was for the use of the local Moss Point congregation. The chancellor found that the other three deeds at issue evinced a clear intent that the property was to remain in the hands of the local congregation.

¶14. Aggrieved by the ruling of the chancellor, Pentecostal now appeals.

## DISCUSSION OF THE LAW

**I. THE TRIAL COURT WAS MANIFESTLY IN ERROR AND ABUSED ITS DISCRETION BY CONFIRMING TITLE IN FAVOR OF FREEWILL PENTECOSTAL CHURCH, RATHER THAN IN FAVOR OF CHURCH OF GOD PENTECOSTAL.**

¶15. In Mississippi,

> Our standard of review for factual determinations made by a trial judge sitting without a jury is the substantial evidence standard. *Hill v. Thompson*, 564 So.2d 1, 10 (Miss.1989); *UHS-Qualicare v. Gulf Coast Community Hosp., Inc.*, 525 So.2d 746, 753 (Miss.1987). We will not disturb the findings of a chancellor when supported by substantial evidence unless the chancellor abused his discretion, was manifestly wrong, clearly erroneous or an erroneous legal standard was applied. *Herring Gas Co. v. Whiddon*, 616 So.2d 892, 894 (Miss.1993).

*Broadhead v. Bonita Lakes Mall, Ltd. Partnership*, 702 So. 2d 92, 96 (Miss. 1997).

¶16. To understand the constitutional boundaries of the inquiry necessitated by this appeal, this Court's authority in adjudicating church property disputes must be described. Civil courts have the general authority to resolve the question of church property ownership. *Jones v. Wolf*, 443 U.S. 595, 602(1979). "The State has an obvious and legitimate interest in the peaceful resolution of property disputes, and in providing a civil forum where the ownership [and control] of church property can be determined conclusively." *Id.*; *Presbyterian Church in the United States v. Mary Elizabeth Blue*

***Hull Mem'l Presbyterian Church***, 393 U.S. 440, 445 (1969). The first amendment to the United States constitution[(2)], however, " 'severely circumscribes the role that civil courts may play in resolving church property disputes.' "[(3)] ***Wolf,*** 443 U.S. at 602 (*quoting* ***Blue Hull***, 393 U.S. at 449). The first amendment, therefore, forbids civil courts from resolving church property disputes by inquiring into and resolving disputed issues of religious doctrine and practice. ***Wolf***, 443 U.S. at 602; ***Maryland & Virginia Eldership of the Churches of God v. Church of God at Sharpsburg, Inc.***, 396 U.S. 367, 368(1970) (Brennan, J., concurring). Accordingly, courts may not support the tenets of any one religion and must respect the right of all persons to choose their own course with reference to religious observance. *See* ***Wolf***, 443 U.S. at 602. States are free to adopt any approach to adjudicate church property disputes " 'so long as it involves no consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith.' " ***Id.*** at 602 (*quoting* ***Sharpsburg***, 396 U.S. at 368) (Brennan, J., concurring).

¶17. The United States Supreme Court first adjudicated a church property dispute in ***Watson v. Jones***, 80 U.S. (13 Wall.) 679 (1872). ***Watson*** involved a church schism and property dispute that arose out of the Civil War. When a group of members of a local Presbyterian church in Kentucky withdrew from the national Presbyterian church rather than obey the national church's order to support the union and disavow slavery, the court was called upon to determine ownership of church property. ***Watson*** held that if a local church is congregational in nature, the ordinary principles that govern associations should be relied upon to determine the rights of the conflicting groups. ***Id.*** at 725. The corporate and property decisions made by a majority of the members of the local church "or by such other local organism as [the congregational organization] may have instituted for the purpose of ecclesiastical government" should be enforced. ***Id.*** at 724. If, however, "the religious congregation or ecclesiastical body holding the property is but a subordinate member of some general church organization in which there are superior ecclesiastical tribunals with a general and ultimate power of control more or less complete, in some supreme judicatory over the whole membership of that general organization", a court has the obligation to enforce the decision of the highest church tribunal that has ruled on a question "of discipline, or of faith, or ecclesiastical rule, custom, or law...." ***Id.*** at 722-23, 727[(4)]. As evidenced by the Supreme Court's decision in enforcing the resolution of the property dispute by the national Presbyterian church in ***Watson***, issues of control over and rights to property are subsumed within that list. *See* ***Sharpsburg***, *supra*, (Brennan, J., concurring).

¶18. Over one hundred years later, the United States Supreme Court adopted and applied a somewhat different approach, invoking the "neutral principles of law" for resolving disputes over church property. ***Wolf***, 443 U.S. at 602. This method, as enunciated by the United States Supreme Court in ***Blue Hull***, relies on objective, traditional concepts of trust and property law familiar to attorneys and judges. It calls "for the completely secular examination of deeds to the church property, state statutes and existing local and general church constitutions, by-laws, canons, Books of Discipline and the like to determine whether any basis for a trust in favor of the general church exists." ***Protestant Episcopal Church in Diocese of New Jersey v. Graves***, 417 A.2d 19, 23 (N.J. 1980), *cert. denied* sub nom. ***Moore v. Protestant Episcopal Church in Diocese of New Jersey***, 449 U.S. 1131 (1981); *see also* ***Sharpsburg***, *supra*. ***Wolf*** concerned a property dispute between the local church and the general church in which the Georgia courts had examined the property deeds, state statutes, local church charter, the general church constitution and Book of Church Order. ***Wolf***, 443 U.S. at 597-602. Because this examination did not reveal any language of trust in favor of the general

church, the Georgia courts were left with a mere connectional relationship between the local and general church that they found was an insufficient basis upon which to establish property rights in the general church. In the absence of anything more, the court ruled that legal title to the church property was vested in the local church congregation. *Id.* at 599-604. In approving this "neutral principles of law" approach as an acceptable method of resolving the particular dispute, the United States Supreme Court concluded that although the analysis may involve examination of some religious instruments, such as a church constitution, the inquiry must be performed in purely secular terms without relying "on religious precepts in determining whether the document indicates that the parties have intended to create a trust." *Id.* at 604.

¶19. Our case law in Mississippi is sparse with regard to the issue before this Court, all predating the United States Supreme Court's decision in *Wolf*. Our most recent case, *Sustar v. Williams*, 263 So. 2d 537 (Miss. 1972), provides an overview of our case law on this issue, as well as relevant case law from other states and the United States Supreme Court, and discusses various approaches to this issue, broaching the neutral principles approach approved by *Wolf* without clearly delineating the approach we should follow in Mississippi. Most of our case law followed the *Watson* " judicial deference" standard discussed, *supra. See Linton v. Flowers*, 230 Miss. 838, 94 So. 2d 615 (1957); *Mount Helm Baptist Church v. Jones*, 79 Miss. 488, 30 So. 714 (1901). This Court now chooses to follow the neutral approach for determination of issues such as in the case *sub judice*. As *Wolf* stated "[t]he primary advantages of the neutral-principles approach are that it is completely secular in operation, and yet flexible enough to accommodate all forms of religious organization and polity" and "relies exclusively on objective, well established concepts of trust and property law familiar to lawyers and judges." *Wolf*, 443 U.S. at 603.

¶20. Applying these principles to the instant case makes clear that for Pentecostal to be entitled to the relief it seeks, Pentecostal must demonstrate either an actual transfer of property from the congregation to the denomination, an express trust, or clear and convincing evidence evincing an intent on the part of the local congregation to create a "trust" in favor of the denomination. *See Hans v. Hans*, 482 So.2d 1117, 1122 (Miss.1986); *Allgood v. Allgood*, 473 So.2d 416, 421 (Miss.1985); *Coney v. Coney*, 249 Miss. 561, 568-69, 163 So.2d 692 (1964); *Green v. Frazier*, 242 Miss. 315, 323, 135 So.2d 399 (1961). As to the first, the evidence adduced at trial demonstrates that the Moss Point congregation, now Freewill, has not transferred the contested realty to Pentecostal. Second, no documents were presented which create an express trust. *See* Miss. Code Ann. § 91-9-1 (1994)[(5)]; Miss. Code Ann. § 91-9-103 (1994).

¶21. Therefore, the only manner by which title can be confirmed in Pentecostal is by either a resulting or constructive trust. Both resulting and constructive trusts are creatures of equity. "The feature which distinguishes constructive trusts from express trusts and resulting trusts is that the former do not arise by virtue of agreement or intention, either actual or implied, but by operation of law, or, more accurately, by construction of the court." 89 C.J.S. Trusts §139 (1955).

¶22. Cases involving questions of resulting trusts have often been before this court. Concerning a resulting trust

> [t]he following principles are recognized and declared by this court: If one buys land in the name of another and pays the consideration therefor, the land will be held by the grantee in trust

for the benefit of him who advances the purchase money; . . . The foundation of trust in such cases is that the property really belongs to him whose funds have paid for it . . . . Property rights are not lost simple[sic] because property is transported into another state and exchanged there for other property.

*Palmer v. Palmer*, 654 So. 2d 1, 2 (Miss. 1995) (*quoting Stone v. Sample*, 216 Miss. 287, 62 So.2d 307, 310 (1953)). Resulting trusts are also the mechanism by which this Courts prevents unfair division of marital property. *Palmer v. Palmer*, 654 So. 2d 1, 2 (Miss. 1995); *Ferguson v. Ferguson*,639 So. 2d 921, 926 (Miss. 1994). A resulting trust is

implied by law from the acts and conduct of the parties and the facts and circumstances which at the time exist and surround the transaction out of which it arises. Broadly speaking, a resulting trust arises from the nature or circumstances of consideration involved in a transaction whereby one person becomes invested with a legal title but is obligated in equity to hold his legal title for the benefit of another, the intention of the former to hold in trust for the latter being implied or presumed as a matter of law, although no intention to create or hold in trust has been manifested, expressly or by inference, and there ordinarily being no fraud or constructive fraud involved.

76 Am. Jur. 2d Trusts § 166 (1992). In other words, a resulting trust is in essence an intention-enforcing trust.

¶23. As to constructive trusts:

In *Sojourner v. Sojourner*, 247 Miss. 342, 353, 153 So.2d 803, 807 (1963), this Court said:

A constructive trust is one that arises by operation of law against one who, by fraud, actual or constructive, by duress or abuse of confidence, by commission of wrong, or by any form of unconscionable conduct, artifice, concealment, or questionable means, or who in any way against equity and good conscience, either has obtained or holds the legal right to property which he ought not, in equity and good conscience, hold and enjoy.

A constructive trust "is raised by equity to satisfy the demands of justice." 76 Am Jur 2d, Trusts, § 21 at 446 (1975). Any transaction may provide an appropriate setting for creating a constructive trust where, for any reason, one party holds funds "which in equity and good conscience should be possessed by" another party. Their forms and varieties "are practically without limit." 89 C.J.S. Trusts, § 142 at 1027 (1955)

This Court stated in *Allgood v. Allgood*, 473 So.2d 416, 421 (Miss.1985), and other cases cited therein.:

A constructive trust is a means recognized in our law whereunder one who unfairly holds a property interest may be compelled to convey that interest to another to whom it justly belongs.

*Russell v. Douglas*, 243 Miss. 497, 505-506, 138 So.2d 730, 734 (1962), presents a concise summarization of constructive trust law in this State:

A constructive trust is a fiction of equity. It is the formula through which the conscience of

equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee. The equity must shape the relief and courts are bound by no unyielding formula. Bogert, Trusts and Trustees, 2d Ed., Sec. 471. It arises regardless of intention or agreement, express or implied. *Rimmer v. Austin*, 191 Miss. 664, 4 So.2d 224 (1941); *Pitchford v. Howard*, 208 Miss. 567, 45 So.2d 142 (1950). The trust is raised by implication of law. Fraud need not be shown. *Adcock v. Merchants & Manufacturers Bank*, 207 Miss. 448, 42 So.2d 427 (1949).

*Planters Bank & Trust Co. v. Sklar*, 555 So.2d 1024, 1034 (Miss.1990). A constructive trust must be established by clear and convincing proof. *Alvarez v. Coleman*, 642 So.2d 361, 368 (Miss.1994); *Planters Bank*, 555 So.2d at 1034; *Allgood v. Allgood*, 473 So.2d 416, 421 (Miss.1985).

¶24. With respect to either a resulting or constructive trust, as to the contested property, the by-laws of Pentecostal and the four deeds concerning the realty become the essential documents that must be examined, as well as the conduct of the Moss Point congregation, as it relates to those documents. First, respecting Pentecostal's by-laws, said by-laws clearly state that "[a]ll deeds and abstract of deeds of any local church shall remain the property of the parent church and shall be sent to the general office and kept there." This, coupled with the language of the by-laws relating to local church secession[6], evinces a clear intent on the part of the by-law of the national church that any property of one of its local churches is the property of the national denomination.

¶25. As such, the relevant inquiry then becomes the relationship between Pentecostal and the Moss Point congregation to determine if the Moss Point congregation was indeed a legitimate "sister church" in affiliation with Pentecostal and if the Moss Point congregation had indeed complied with the by-laws of Pentecostal. In the instant case, the relationship between Pentecostal and the Moss Point congregation is unclear and, based on the facts enumerated *infra*, the relationship is tenuous at best.

¶26. First, there was no evidence produced at trial that the Moss Point congregation had adopted the by-laws of Pentecostal. In fact, the testimony demonstrates otherwise. The Moss Point church elected its own trustees and, even by Davis's own testimony, has not complied with the by-laws.

¶27. Second, the by-laws of Pentecostal were not even in existence until at least 1963. Davis contends that the by-laws were in place at the inception of Pentecostal, which were not in print until the 1960's. On this basis, the by-law clearly would not be applicable to a 1958 real estate transaction, *i.e.,* the root deed in the instant case. Pentecostal did not exist as a corporate entity until 1961, the year of incorporation in Alabama. Only then would the church have been authorized to have branch churches. Therefore, Pentecostal could not have had an ownership interest in any property purchased by the Moss Point congregation in 1958.

¶28. Third, there was evidence adduced at trial which indicated that Pentecostal did not consider any Mississippi congregations as a part of its denomination. Davis, in a 1993, executed, sworn affidavit set forth the various states in which sister churches had been established. The state of Mississippi was not found on that list. Beyond that, Pentecostal's by-laws require that any sister church be incorporated in their own state and qualified as doing business there. Davis admitted that there was no incorporation or registration of a foreign corporation in Mississippi until 1993. On this rationale,

the earliest time in which a sister church in Mississippi could be established was 1993. Additionally, the people of Moss Point "fellow-shipped" with several other denominations. The Moss Point congregation had no voice or vote at any meeting or conference of Pentecostal. Further, Mississippi had no state bishop until 1982.

¶29. Fourth, the by-laws of Pentecostal required, first, that all deeds be sent to and held in the general office of the denomination; second, that all branch churches provide a semi-annual report to the general office setting forth all real property, mortgages, and loans; and, third, that assessments be sent to the general office. Davis never requested the deeds to the contested realty. He, in fact, did not claim ownership of said property until 1993. The Moss Point congregation did not send the deeds to the general office, nor did they send the semi-annual reports to the general office. Testimony indicated that the assessments were sent, at best, sporadically, and monies were paid to other denominations.

¶30. Fifth, assuming *arguendo*, that Moss Point did indeed became a "sister church" in Pentecostal in 1993, the date of incorporation in Mississippi by Pentecostal (a tenuous assumption based upon the record), the by-laws of Pentecostal require that the title be confirmed in the Moss Point congregation, now Freewill:

> Brethern who are established and do not wish to deed their property into the Church of God Pentecostal, Inc. shall be granted. Yet accumulated property thereafter shall be purchased as Church of God Pentecostal, Inc., whether loan.

¶31. Based upon a reading of Pentecostal's by-laws, as viewed under neutral-principles, and the conduct of the parties with respect to those by-laws, as reflected by the testimony and exhibits, the clear conclusion is that the Moss Point congregation, if even aware of the by-laws, did not adopt or abide by them. Therefore, the local congregation did not, on the basis of the by-laws, evince an intent to purchase or hold the contested realty in trust for Pentecostal.

¶32. The four deeds, the other documents relevant to the inquiry concerning a constructive or resulting trust, must, under neutral-principles, be construed according to our property law.

> In construing instruments of conveyance, "it is necessary under well recognized rules of construction that they be considered as a whole, and the intent of the parties be gathered from the plain and unambiguous language contained therein." ***Rogers v. Morgan***, 250 Miss. 9, 21, 164 So.2d 480, 484 (1964). "[T]he meaning of the language and intention of the parties to be determined by the Court is to be found in the language used in the instrument." ***Id.***; ***Pursue Energy Corp. v. Perkins***, 558 So.2d 349, 351-53 (1990); *see* also ***Simmons v. Bank of Mississippi***, 593 So.2d 40, 42-43 (Miss.1992) [in construing written instruments, "our concern is not nearly so much what the parties may have intended as it is what they said, for the words employed are by far the best resource for ascertaining intent and assigning meaning with fairness and accuracy," *quoting* ***UHS-Qualicare v. Gulf Coast Comm. Hosp.***, 525 So.2d 746, 754 (Miss.1987)]. Clear, unambiguous instruments must be construed as written[.] ***Cherry v. Anthony, Gibbs, Sage***, 501 So.2d 416, 419 (Miss.1987). Courts must ascertain the meaning of the language actually used, and not "some possible but unexpressed intent of the parties." ***Simmons***, 593 So.2d at 42-43, *quoting* ***Cherry***, 501 So.2d at 416. The parties obviously disagree over that meaning, but that fact alone does not render the instruments ambiguous. ***Id.***

On the question of whether the instruments are unambiguous, and if so, their meaning and effect, we review the chancellor's decision *de novo* for these two issues present questions of law. ***Lamb Const. Co. v. Town of Renova***, 573 So.2d 1378, 1383 (Miss.1990); ***Dennis v. Searle***, 457 So.2d 941, 945 (Miss.1984); *see also* ***Moore & Munger Marketing and Refining, Inc. v. Hawkins***, 962 F.2d 806 (8th Cir.1992); ***Bennett v. Local Union No. 66, et al.***, 958 F.2d 1429 (7th Cir.1992).

***Whittington v. Whittington***, 608 So. 2d 1274, 1278 (Miss. 1992). In the instant case, the chancellor found that the 1958 root deed was ambiguous. The grantee in the 1958 root deed was THE CHURCH OF GOD PENTECOSTAL, GENERAL ASSEMBLY. Testimony at trial advanced two meanings of the term "general assembly." Pentecostal argued that the term referred to the national denomination. Freewill argued that it referred to the local congregation. The chancellor found the language in this deed to be ambiguous. He then considered the circumstances surrounding the purchase to ascertain the intent of the parties. The chancellor found that the local congregation was not affiliated in any way with any national organization and placed great importance upon the purchase price of the property being raised entirely by the local folk, finding that Pentecostal could not provide any proof that they it contributed at all to the purchase price. The chancellor determined that the intent of the parties was that the property was purchased on behalf of the local congregation.

¶33. Upon *de novo* review of the chancellor's determination, this Court finds that the chancellor was correct in his finding that the 1958 deed was indeed ambiguous and that the parties' intent was that the realty was purchased for the local congregation. As discussed earlier, Pentecostal was not incorporated until 1961 and had no printed by-laws at the time of the purchase. Based upon the testimony presented at trial, Pentecostal's assertion that the land was purchased on its behalf is unfounded.

¶34. As to the remaining three deeds, the chancellor found that the clear intent of the language of the deeds was that the property was specifically purchased by the local congregation on their own behalf and not on behalf of Pentecostal. The record strongly supports the chancellor's finding as to these three documents. The deeds contain clear language which indicate the intent, as found by the chancellor.

¶35. As the discussion, *supra*, clearly demonstrates, neither the deeds, the by-laws, or the conduct of the parties relating to those documents evinced any intent to create a trust in favor of Pentecostal. Also very clear is that the facts and circumstances do not indicate those sufficient to support the impression of a constructive trust to this Court. Pentecostal has clearly not carried its burden of demonstrating that such a trust exists or should be raised. This court finds that this assignment of error is without merit.

## II. THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN REFUSING TO ADMIT INTO THE RECORD CERTAIN TESTIMONY UNDER RULE 406 OF THE MISSISSIPPI RULES OF EVIDENCE.

¶36. Our standard of review for the admission of or refusal to admit evidence is well settled. "`[A]dmission or suppression of evidence is within the discretion of the trial judge and will not be reversed absent an abuse of that discretion.'" ***Broadhead***, 702 So. 2d at 102 (*quoting* ***Sumrall v. Mississippi***

***Power Co.***, 693 So.2d 359, 365 (Miss.1997)); ***General Motors Corp. v. Jackson***, 636 So.2d 310, 314 (Miss.1992), *cert. denied*, 513 U.S. 928 (1994); ***Walker v. Graham***, 582 So.2d 431, 432 (Miss.1991).

¶37. Pentecostal argues that the chancellor erred by not allowing testimony from Davis regarding Langer's purported attempt to siphon members from a sister church in Mobile, Alabama, affiliated with Pentecostal. Upon proffer of Pentecostal, the chancellor refused to admit this evidence because it would involve consideration of ecclesiastical issues, which is outside the parameters of the application of neutral principles. Pentecostal asserts that the denial of such testimony was an abuse of discretion by the chancellor, arguing that the testimony should have been admitted as relevant and probative evidence pursuant to Miss. R. Evid. 406.

¶38. This Court has discussed Miss. R. Evid. 406 as it relates to our rules regarding relevancy:

> Rule 401 of the Mississippi Rules of Evidence defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable than it would be without the evidence." Furthermore, Rule 403 of the Mississippi Rules of Evidence reads, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Finally, Rule 406 states that

> Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice.

> M.R.E. 406.

***Hans Constr. Co., Inc. v. Drummond***, 653 So. 2d 253, 265 (Miss. 1995).

¶39. First, whether the proffered testimony fits the framework of Miss. R. Evid 406 is questionable at best. The instance that Davis wished to testify to was a single other occurrence of behavior. As the comment to Miss. R. Evid 406 states:

> Habit is considered to be an individual's usual method or manner of doing things. Routine practice refers to a group or institution's habit. *See*McCormick, Evidence, 3rd Ed., § 162. Thus, we speak of a person's habit and the routine practice or custom of an institution. Mississippi has long recognized that under appropriate circumstances habit and custom are relevant evidence. Under Rule 406, evidence of habit or routine practice can be used as circumstantial evidence. A party may introduce evidence of a person's habit to imply that he probably acted in this instance in conformity with his habit.

With that comment as a reference, Davis's proffered testimony that Langer had attempted to siphon members on only one other occasion cannot be said to be evidence of a usual routine or method of doing things.

¶40. Second, the relevance of the proffered testimony must be examined. The proffered testimony has

little to do with the inquiry at hand, as set forth in the discussion of the first assignment of error, *supra*. Davis's testimony would add little to the relationship of the Moss Point congregation with Pentecostal with reference to the contested realty.

¶41. Third, the proffered testimony comes very close to crossing, if indeed not so doing, the line which requires the chancellor to consider ecclesiastical matters. Had the chancellor admitted the proffered testimony, he would have had to consider matters of a religious nature in determining the issue at the heart of this case.

¶42. As such, the chancellor's decision to exclude Davis's testimony on this issue cannot be said to be an abuse of discretion. This assignment of error is without merit.

## CONCLUSION

¶43. Pentecostal seeks to have title in the contested realty confirmed in it. To succeed, Pentecostal had the burden to demonstrate that the property was held in trust for it by the Moss Point congregation or show that the deeds evinced such. This it failed to do. The chancellor did not abuse his discretion in confirming title in Freewill, nor did he abuse his discretion in excluding Davis's testimony regarding Langer's alleged attempt to siphon members from a sister church. Accordingly, we affirm the chancellor's decision to confirm title in Freewill.

¶44. **AFFIRMED.**

**PRATHER, C.J., SULLIVAN AND PITTMAN, P.JJ., BANKS, ROBERTS, SMITH AND MILLS, JJ. CONCUR. McRAE, J., CONCURS IN RESULT ONLY.**

1. This statement of the facts is extracted primarily from the Ruling and Opinion of the Court by the chancellor below, which was found to be a fair and complete representation of the facts as found in the record.

2. The first amendment to the United States constitution provides in relevant part: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ."

3. The first amendment to the United States constitution is applicable to the states through the fourteenth amendment. *See **Cantwell v. Connecticut***, 310 U.S. 296 (1940).

4. The absolute deference afforded the decisions of hierarchical church tribunals has been subsequently tempered by the United States Supreme Court in ***Serbian Eastern Orthodox Diocese v. Milivojevich***, 426 U.S. 696, 713 (1976), in which the court stated that determinations by such tribunals will be enforced in the absence of fraud or collusion.

5. Miss. Code Ann. § 91-9-1 states, in relevant part: "Hereafter all declarations or creations of trusts or confidence of or in any land shall be made and manifested by writing, signed by the party who declares or creates such trust, or by his last will, in writing; or else they shall be utterly void. Every writing declaring or creating a trust shall be acknowledged or proved as other writings [and] . . . shall

be lodged with the clerk of the chancery court of the proper county to be recorded, and that trust shall only take effect from the time it . . . is so lodged for record. Where any trust shall arise or result, by implication of law, out of a conveyance of land, such trust or confidence shall be of the like force and effect the same as it would have been if this statute had not been passed." The requirement under the predecessor statute required similar requirements as to an express trust.

6. Article 7 of the by-laws, regarding seceding of churches, states, in relevant part: "No church that is the property of the parent church of the Church of God (Pentecostal) Incorporated thereof shall at any time secede from the parent church. All properties (real) shall at any and all times remain the property of the parent church."